[Civ. No. 25236. First Dist., Div. One. Nov. 4, 1969.]

CITY OF PLEASANT HILL, Plaintiff and Appellant, v.
FIRST BAPTIST CHURCH OF PLEASANT HILL,
Defendant and Respondent.

385

COUNSEL

Charles J. Williams for Plaintiff and Appellant.

Cox & Cummins, James E. Cox and Bernard F. Cummins for Defendant and Respondent.

OPINION

**SIMS, J.**—Plaintiff city has appealed from a condemnation judgment entered on a jury verdict awarding the defendant church $86,000, consisting of $39,000 for property condemned for a city street, and $47,000 for damages to the remainder of the property. The city contends that the trial court committed prejudicial error in its rulings upon the admissibility of certain evidence; that the trial court erred in refusing the city's offer of proof for the purpose of impeachment upon the issue of severance damage; that the severance damage award is excessive and not supported

by any evidence; that the city was denied a fair trial and due process of law because of jury misconduct and irregularity in the jury proceedings; and that the city was denied a fair trial because of the misconduct of the church's counsel. An examination of these contentions reveals no prejudicial error. The judgment must be affirmed.

## Basic Facts and Issues

In its before condition the property consisted of 70,809 square feet. It may be visualized as the letter "L" with the horizontal base running 422.20 feet from south (left) to north (right), where it abutted upon an established thoroughfare. The vertical part of the "L" rested on the southerly 270 feet of the base and extended westerly (upward) approximately 225 or 226 feet to form almost a square. The horizontal part of the "L" had a frontage from east (bottom) to west (top) of 65 feet on the established thoroughfare, and on the east (top) ran southerly, at a uniform width of 65 feet, 150.34 feet to a point where it joined the main part of the property.

The property condemned consisted of the entire northerly (right) extension of the "L" approximately 65 feet by 150 feet, and a 60-foot strip off the easterly side (bottom) of the remainder of the property, for a total of 26,068 square feet as computed by the city's witness. This property included a graveled driveway which led in from the thoroughfare on the north to a parking area on property not condemned, and also a driveway from the parking area to the end of a street which abutted on the base of the property before the take, about 35 feet easterly of the southeast corner.

After the condemnation the church was left with 44,847 square feet with a frontage of 270 feet on the newly constructed street, which was designed and constructed as a north-south thoroughfare. The property had been first improved with one structure in 1954, and additions to this structure were constructed in 1956. At the time of the condemnation these improvements, consisting of approximately 2,400 square feet of enclosed space and 580 square feet of porch, housed a kitchen, nursery and Sunday School rooms. Immediately adjacent was a chapel, Sanctuary or auditorium with office and extra rooms which had been constructed in 1963, and enclosed an additional approximately 2,625 square feet. These improvements, together with landscaping and paving for the parking area and walkways, remained after the condemnation.

The principal issue at the trial was whether the church had suffered any severance damages. All witnesses who testified, whether concerning suitable use, or value or both, agreed that before the taking the highest and best use of the property was for church purposes. All those appraising the property approached the question of value by appraising the land on the

basis of comparable sales, and the improvements on the basis of reconstruction cost, some with, and some without an allowance for depreciation.[1]

The pastor of the church, two members of its congregation who were active in affairs of the church, and two independent clergymen, a rabbi and a Presbyterian minister, testified to the effect that after the taking the property was valueless for church purposes, and that the congregation would have to find a new site. Two appraisers echoed these views and, with the pastor and the minister, gave estimates of severance damage predicated upon the loss of the value of the improvements.

For the city, three ministers, including a former pastor of the defendant church, and two architects, one of whom had laid out a plan of development for the entire property which the church claimed represented its needs, testified that the remaining property was still suitable for church purposes after the taking and could be adapted to the needs contemplated by the

---

[1]Evidence was introduced of isolated sales of a church property, and the city at first objected to evidence of reproduction cost as manifesting the value of the improvements. Nevertheless, it appears that the parties and witnesses either expressly (witness Orr for plaintiff, and witness Wallace for defendant) or tacitly recognized the rules articulated in *First Baptist Church* v. *State Dept. of Roads* (1965) 178 Neb. 831 [135 N.W.2d 756], as follows: "Where there is proof that there is no market value of property with a specialized use, such as a church, convent, hospital, college premises, or the like, the general rule is that resort may be had to some other method of fixing the value of property. *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authority,* 335 Mass. 189 [138 N.E.2d 769]. See, 4 Nichols on Eminent Domain (3d ed.), § 12.32, pp. 217 to 228; 5 Nichols on Eminent Domain (3d ed.), § 18.41 (3), p. 230, § 18.42, p. 234; Jahr, Eminent Domain, §§ 71, 78, 82, pp. 102, 111, 116 (specialty uses), §§ 83, 84, pp. 117, 118 (properties of nonprofit organizations); 1 Orgel on Valuation Under Eminent Domain (2d ed.), §§ 30, 37 to 40, especially at pp. 177 to 179, 181 to 183; Manify, *Elements of Damages in Eminent Domain,* 34 B.U.L. Rev. 146, 151, 152; McCormick, *The Measure of Compensation in Eminent Domain,* 17 Minn. L.Rev. 461, especially at pp. 467 to 470.

"Depending on the nature of the property, the authorities have supported different methods of determining value in these situations. Expert testimony as to reproduction or replacement cost, less depreciation, has been approved in many cases as competent foundation evidence to support an opinion as to valuation. See 4 Nichols on Eminent Domain (3d ed.), § 12.32, notes 18 and 19, pp. 227, 228, and cases cited thereunder." (178 Neb. at pp. 836-837 [135 N.W.2d at pp. 759-760]. In addition to authorities cited, see *Assembly of God Church of Pawtucket* v. *Vallone* (1959) 89 R.I. 1, 10 [150 A.2d 11, 15-16]; *Graceland Park Cemetery Co.* v. *City of Omaha* (1962) 173 Neb. 608, 611 [114 N.W.2d 29, 31]; *City of Chicago* v. *Farwell* (1919) 286 Ill. 415, 419-420 [121 N.E. 795, 797]; *Idaho-Western Ry. Co.* v. *Columbia Conference etc. Synod* (1911) 20 Idaho 568, 583 [119 P. 60, 65, 38 L.R.A. N.S. 497]; Condemnation Practice (Cont.Ed. Bar 1960) § 2.23, p. 34). These rules have been recognized but not applied in this state. (See *People* v. *Ocean Shore R. R., Inc.* (1948) 32 Cal.2d 406, 427-428 [196 P.2d 570, 6 A.L.R.2d 1179], and its reference to *City of Los Angeles* v. *Klinker* (1933) 219 Cal. 198, 211-212 [25 P.2d 826, 90 A.L.R. 148] and *Joint Highway Dist. No. 9* v. *Ocean Shore R. R. Co.* (1933) 128 Cal.App. 743, 759-760 [18 P.2d 413]; also *Napa Union High School Dist.* v. *Lewis* (1958) 158 Cal.App.2d 69, 73 [322 P.2d 39], and *People* v. *Jones* (1945) 67 Cal.App.2d 531, 537 [155 P.2d 71].)

church. Two appraisers agreed with this conclusion and testified there were no severance damages. A third, who had originally appraised the property for the church, was called by the city as a witness and testified that the buildings would be useful for church purposes after the taking. Nevertheless, he opined that the remaining property had suffered severance damages of $22,500. Neither party explored the basis on which this witness predicated his estimate of severance damage.

The foregoing testimony is reviewed in more detail below. It, together with testimony as to land values, is summarized in Appendix A annexed hereto and made a part of this opinion. Despite substantial evidence to the contrary, 11 jurors and the trial court in denying a motion for new trial, approved the theory inherent in the testimony of the witnesses produced by the church. With the foregoing background the city's contentions can be examined in the light of the relevant evidence.

*Plan and Model of Church's Development Plan*

The church produced a plan proposed in 1957, and a large scale model which portrayed graphically and in three dimensions the utilization of the whole of the original property for the development of improvements for church purposes.

At the outset the city indicated its objection to the use of this evidence. It moved the court to exclude the model from the view of the jury. This motion was denied on the theory that the model, without removable structures which represented proposed as distinguished from existing structures, correctly depicted the appearance of the property before the taking, and showed the portion condemned.

Subsequently, Mr. Norried, the head usher and former member of the trustee's board and board of deacons of the church, testified that the graphic plan represented a master plan prepared by architect Dennis and accepted by the board of trustees of the church in 1957; that because of lack of money the sanctuary was not built according to the master plan. (It is smaller and was located more easterly to abut on and furnish convenient access and joint use with the previously constructed assembly hall.) This witness identified the removable structures which accompanied the model in relation to proposed structures on the graphic plan, and placed them on the model. The city's objection to the introduction in evidence of the graphic plan and the three dimensional model with the proposed structures was overruled.

The proposition upon which the city relies for the exclusion of the foregoing evidence, and the grounds the church asserted for its admission are both found in the following passage from *Sacramento etc. R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408 [104 P. 979]: ". . . this court by its latest utterances has definitively aligned itself with the great majority of the

courts in holding that damages must be measured by the market value of the land at the time it is taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that therefore while evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value. For such evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value— the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use." (156 Cal. at p. 412. See also *People v. Chevalier* (1959) 52 Cal.2d 299, 309 [340 P.2d 598]; *People v. LaMacchia* (1953) 41 Cal.2d 738, 751 [264 P.2d 15]; *Long Beach City High School Dist. v. Stewart* (1947) 30 Cal.2d 763, 771-772 [185 P.2d 585,173 A.L.R. 249]; *City of Oakland v. Pacific Coast Lbr. etc. Co.* (1915) 171 Cal. 392, 399-400 [153 P. 705]; *San Bernardino County Flood Control Dist. v. Sweet* (1967) 255 Cal. App.2d 889, 899 [63 Cal.Rptr. 640]; *People ex rel. Dept. Public Works v. Silveira* (1965) 236 Cal.App.2d 604, 627 [46 Cal.Rptr. 260]; *People ex rel. Dept. of Public Works v. Alexander* (1963) 212 Cal.App.2d 84, 93-94 [27 Cal.Rptr. 720]; *People ex rel. State Park Com. v. Johnson* (1962) 203 Cal.App.2d 712, 716-717 [22 Cal.Rptr. 149]; *Buena Park School Dist. v. Metrim Corp.* (1959) 176 Cal.App.2d 255, 260-261 [1 Cal.Rptr. 250]; *Laguna Salada etc. Dist. v. Pacific Dev. Co.* (1953) 119 Cal.App.2d 470, 476 [259 P.2d 498]; *City of Daly City v. Smith* (1952) 110 Cal.App. 2d 524, 531-532 [243 P.2d 46]; *East Bay Municipal Utility Dist. v. Kieffer* (1929) 99 Cal.App.240, 250-251 [278 P. 476, 279 P. 178]; *City of Stockton v. Vote* (1926) 76 Cal.App. 369, 403 [244 P. 609].)

The city relies upon that portion of the opinion in *People v. Chevalier, supra,* which states: "Defendants finally contend that the court erred in denying admission of an architect's sketch showing a proposed improvement of their land. Defendants sought to show thereby that their property in one single piece, without the street bisection, would be suitable and valuable for building a motel and restaurant project, and that the severance ruined the prospect of such a development. It is true that evidence of a proposed use may be relevant, not to enhance damages but to show that the proposed use is feasible and, as such, might enter into a determination of the market value. (*Laguna Salada etc. Dist. v. Pacific Dev. Co.,* 119 Cal. App.2d 470, 476 . . .) However, all the experts agreed that the land was suitable and valuable, before but not after the condemnation, for the building of a motel and restaurant project, and that this would have been a

feasible plan for the use of the property. It therefore appears that the sketch of a specific plan or development could have no other purpose than to attempt to enhance damages, and its rejection was proper. (*People* v. *LaMacchia,* 41 Cal.2d 738, 751 . . .; *City of Los Angeles* v. *Kerckhoff-Cuzner Mill & Lbr. Co.,* 15 Cal.App. 676, 677-678 . . .)" (52 Cal.2d at p. 309. See in addition to the cases last cited, *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 901; *People* ex rel. *Dept. of Public Works* v. *Alexander, supra,* 212 Cal.App.2d 84, 93-94 and 99-100; *People* ex rel. *State Park Com.* v. *Johnson, supra,* 203 Cal.App.2d 712, 716-718; *Laguna Salada etc. Dist.* v. *Pacific Dev. Co., supra,* 119 Cal.App.2d 470, 476; and *San Joaquin etc. Canal & Irr. Co.* v. *Stevinson* (1923) 63 Cal.App. 767, 769-772 [220 P. 427].)

On the other hand, the church points out that *People* v. *Chevalier, supra,* recognizes ". . . evidence of a proposed use may be relevant . . . to show that the proposed use is feasible and, as such, might enter into a determination of the market value." (52 Cal.2d at p. 309. See also *People* v. *La Macchia, supra,* 41 Cal.2d 738, 751; *City of Santa Ana* v. *Harlin* (1893) 99 Cal. 538, 543-544 [34 P. 224]; *Spring Valley Water Works* v. *Drinkhouse* (1891) 92 Cal. 528, 532-534 [28 P. 681]; *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 900 and 902; *Buena Park School Dist.* v. *Metrim Corp., supra,* 176 Cal.App.2d 255, 262-263; *City of Daly City* v. *Smith* (1952) 110 Cal.App.2d 524, 532-533 [243 P.2d 46]; *City of Stockton* v. *Vote, supra,* 76 Cal.App.369, 405.)

■ In this case the plan and model were illustrative of the conceded fact that the property before the taking was suitable and adaptable for the uses of a growing church. Since all concerned agreed that this was the highest and best use of the property as it was then constituted, no prejudice resulted on that phase of the case. The jurors observed the actual improvements on the premises, and it is clear that in their award for the value of the property taken they did not include the value of any phantom improvements.

The city asserts, "It is an indisputable fact that the severance damage testimony is based entirely and exclusively upon the alleged inability of the church to follow the layout on their 1957 drawing." From this predicate it concludes, "The injection into the case of the proposed building layout and the argument that there was severance damage because the so-called master plan could not be followed permitted the jury to indulge in the wildest speculation and conjecture without limitation, qualification, or guidance from the trial court." Under these circumstances, the prejudice inherent in the possibility that the jurors misunderstood the use of the evidence would require a reversal. (*People* ex rel. *State Park Com.* v. *Johnson, supra,* 203 Cal.App.2d 712, 718.) The testimony, however, fails to sustain the hypothesis on which the city bases its conclusion.

■

Mr. Norried, a member of the church since 1955, testified as to the construction which had been accomplished by the church, the nature and number of its congregation, and its activities, and identified the plan and model. He testified that in the before condition the property was a good site to use for church purposes because it was accessible, it was back off the street and free from traffic noises and hazards, and it had sufficient room for outdoor activities and for future expansion with other buildings. He stated that the church was crowded on the remaining property, and that in the absence of the taking, it definitely would have gone forward and built further structures in keeping with the master plan. He stated that in his judgment the church was going to have to move; that since the street had been completed it was difficult to carry on services there without interruption because of the traffic; and that the church had lost its privacy.

Mr. Wedell the Sunday School superintendent testified that the Sunday School classes were full to capacity, and that some classes were using facilities which were not designed for or suitable for such use. He acknowledged his familiarity with the plan and model, and by reference to the model he explained the need for outdoor and indoor facilities for three different age groups. He concluded that if the church could not have the proposed buildings it could not grow, and that it would be necessary to move to a new site.

Rabbi Robbins testified that a location with accessibility and privacy was important to a church; that the property after the taking and construction of the new street was of limited value for church purposes, and was not in a good location; and that in the before condition the premises, although small, were well located and adequate to carry out the purposes depicted in the master plan of the church which he had examined. He concluded that the property in its after condition had no value for church purposes.

Reverend Kinsey testified that the church in its before condition was in a good location and met criteria of visibility and accessibility; that the lot size was minimal but adequate for church development; and that on viewing the property he formed a judgment that in its original condition its use could be planned through the development of a multiple use facility expanding into further single use facilities. He stated that it was generally recognized that there is a broadened concept of the church program calling for more and more use of building facilities, which he described; that in its after condition the property was inadequate for the church because it had been cut off from any future growth or development; and that in his opinion the only solution was for the church to move. He acknowledged on cross-examination that he had examined the church's 1957 plan, and he assumed, that since they had worked with an architect, it was adequate to carry out the church's concept of what they were building for. When asked to explain why the church structures were not usable for church purposes, he

answered, "I think they are useable in a limited sense but for a congregation that anticipates any development whatever they are frustrated or pegged to their present level and not able to do any real expansion or growth, either in numbers or terms of their available services to the community." He indicated that the inability to develop the property according to the church's plan for ultimate development would deprive it of the means to perform the functions contemplated and to meet its projected program, and thereby render the church unsuccessful in the eyes of its members and the community at large.

The pastor testified that before the taking the church was located on one of the most desirable sites one could find because it was secluded from traffic, yet exposed, visible and accessible; that the site was small but adequate for the tasks the church had to perform in a growth situation. He stated that after the taking the traffic noises on the newly constructed adjacent street were a source of distraction; that in his opinion the use of the space available before condemnation had been properly planned; and that the church should move because it needed more space than was available after condemnation in order to grow with the proper facilities to perform and carry on its ministry. On cross-examination he narrated the background of the 1957 "master plan" as it had been explained to him after he came to the church, over one year after the condemnation action had been filed. He stated that it had been held up as a plan which the church had intended to follow, if the road had not been constructed, and that the plan appeared to meet the needs of the congregation as projected into a future time for which it was drawn. Near the end of the witness' cross-examination the following is reported: "Q. Now as I understand it is your feeling that the loss of value of the church, of the improvements, is based upon the 1957 sketch plan, your position being that the buildings can no longer be used as a church, according to the master plan, is that right? A. For the purposes of the church, yes, sir, that's right."

Witness Wallace, a real estate broker and appraiser, testified that the property in its condition before the taking was in an excellent location for church purposes; that it was well shaped because it did not have exterior circulation which would interrupt or take up unnecessary space; that it was removed from a standpoint of being quiet and yet close to a main street; that it permitted adequate parking without interference with the determined uses of the rest of the parcel as indicated on the plan; and that the layout seemed very good for expansion in the future for the objectives and purposes of the church people. He stated that there was no market for the property as church property because there was still land available in the county for the development of church sites, and churches were planning to accommodate the ultimate plans [sic, needs] of their congregations. In the course of his investigation he talked with Rabbi Robbins, Reverend Kinsey,

Pastor Myrant, Mr. Norried, and the pastor of another church, and he listed the Pleasant Hill churches with their lot sizes. He felt the church structure itself was no longer valuable because the area remaining was not sufficient for the church to carry out its plans for expansion for its congregation. According to this witness there should be no adjustment to the severance damages for salvage value (see 4 Nichols, *op.cit.*, § 14.23, pp. 528-542, particularly p. 542), because the salvage value of the improvements was about equal to the cost of demolition.

Witness Paul Johnson, also a real estate broker,[2] testified that for three or four years he had been engaged in locating properties for future growth in Alameda and Contra Costa Counties for the Oakland Diocese of the Catholic Church. In his opinion the location of the church property furnished seclusion and accessibility, and although the site was not actually large it was adequate for that church at the time of the taking. He was familiar with the layout of the "master plan." He had discussed it with the pastor and had seen the model. He stated that in his judgment "this growing church cannot stay in this particular site" after the taking. He noted that after the taking the church, which had a very private useful access and a sedate setting, was located on a very busy major thoroughfare and semi-speedway. He added, "I think with the growth of the master plan as they have projected and have visibly in front of me now just does not allow them to build out on the remaining land that they have. They have crowded classroom conditions on the site. The parish, I believe you call it, is growing and new members coming in and they don't have full facilities to take care of them." He opined that in the after condition the existing improvements could not be resold for church purposes, and he concluded that the church suffered severance damages in a sum equal to the replacement costs of those improvements. On cross-examination the witness, after reiterating that the taking rendered the property nonusable for this particular church, added: "For any church needs I would say it is nil . . . we have a similar situation. They have a true need for growth in the area. . . ."

In the face of substantial evidence to the contrary, the church persuaded the jury to deduce from the foregoing testimony that the taking destroyed the usability of the remaining premises for church purposes. The testimony set forth above, which was elicited without objection, embodies three concepts: first, that the property could no longer be used by this church because the physical space on which it planned to erect specific physical

---

[2]By motion before this court (Cal. Rules of Court, rule 23), the city sought to produce evidence that the witness testified in a subsequent trial that he had attended Saint Mary's College for two years, and that his testimony in this action that he had graduated from that institution was a misquote or a misunderstanding on his part because he did not graduate from that institution, and that in the subsequent action he further recanted and acknowledged that he only attended Saint Mary's College for one semester. This motion was denied.

structures had been taken; second, that the property could no longer be used by this church because the physical space necessary to carry out the planned program and activities and growth of this church, and to construct the physical structures necessary for those purposes was no longer available; and third, that the property could no longer be used by any church because the physical space necessary to carry out the program and activities generally considered necessary for any growing church, was no longer available.

Any attempt to establish damages on the basis of the first concept directly conflicts with the precedents cited above upon which the city relies. ■ Mere frustration of the owner's plans is not generally compensable, and no reason suggests itself why a different rule should apply to so-called service property without a specific showing to sustain a finding the property has lost its general adaptability for the selected use, be it church, school, or other institution. ■ The general rule, with respect to property held for projected development has been phrased as follows: "This evidence was not admissible however, for the purpose of showing special damage sustained by the company as the result of the frustration of its plans for development; and if the evidence is admitted in the further trial of the case, this should be made clear by proper instructions. The measure of damages which the company is entitled to recover is the value of the land taken plus the depreciation in the market value of the remainder due to the use made of the part taken, not any special damage it may have suffered through frustration of its plans. [Citations.]" (*West Virginia Pulp & Paper Co.* v. *United States* (4th Cir. 1952) 200 F.2d 100, 104.)

Evidence was clearly admissible under the third concept because if the property had lost its utility for general church purposes, the church involved not only suffered specific direct damage, but was indirectly damaged with respect to any market value of the property because of the loss of whatever potential buyers might possibly have been found for the special church use. ■ "Such factors as the size and shape of the remainder, loss of highway frontage [here gain of highway frontage without appreciable gain in accessibility, and with loss of privacy and seclusion], and impairment of the use of the property by showing the uses to which the property was adaptable prior to the taking and the limited uses to which the property may be devoted thereafter may properly be considered in determining severance damage. [Citations.]" (*San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 902. See also *People* ex rel. *Dept. Public Works* v. *Lipari* (1963) 213 Cal.App.2d 485, 491-493 [28 Cal.Rptr. 808]; *West Virginia Pulp & Paper Co.* v. *United States, supra,* 200 F.2d 100, 104; *Producers' Wood Preserving Co.* v. *Commissioners of Sewerage* (1928) 227 Ky. 159, 167-168 [12 S.W.2d

292, 295-296]; and *Board of Education* v. *Kanawha & M. R. Co.* (1897) 44 W.Va. 71, 73-75 [29 S.E. 503, 504].)

The second concept lies between the other two. Reflection indicates that if the special user is to be protected where the whole of the property is taken (see fn. 1, above), it is entitled to similar protection where the taking renders the property unusable for the purposes of that special user. If a school serving 200 pupils were left without a playground because the property was taken for a higher public use, the proposition that it had lost its utility for school purposes would not immediately be answered by showing that half the school buildings could be torn down so as to furnish adequate facilities for 100 pupils. (Cf. *Board of Education* v. *Kanawha & M. R. Co., supra,* 44 W.Va. 71, 73-75 [29 S.E. 503, 504].) Testimony was properly received of the specific needs and programs of the church involved in relation to the whole property originally held, and to the residue remaining after the taking. (See *West Virginia Pulp & Paper Co.* v. *United States, supra,* 200 F.2d at p. 103; and *Producers' Wood Preserving Co.* v. *Commissioners of Sewerage, supra,* 227 Ky. 159, 167-168 [12 S.W.2d 292, 295-296].) The city gave tacit acknowledgement to the propriety of general evidence of this nature by its failure to object. Affirmatively it met the church's evidence by opinion and demonstrative evidence which indicated that the property would support properly designed facilities which would accommodate the program and activities of the church as revealed by all of the testimony, including the controversial exhibits.

From the foregoing it may be deduced that the plan and the model had some relevancy in demonstrating the space needed for church needs in general, and the particular needs of the condemnee church. The prejudice in directing attention to particular structures which the church proposed to erect on the property taken, would have warranted the rejection of the evidence insofar as it tended to support an improper theory of damage. (See *People* v. *Chevalier, supra,* 52 Cal.2d at p. 309.) Nevertheless, under the circumstances, the use of these two items as illustrative of proper testimony was not prejudicial error, and no abuse of the court's discretion in ruling on evidence of such nature has been demonstrated.

The situation may be likened to that of the testimony of the expert witness in *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* of whom the court said, "Mr. Hagen testified extensively on the issue of severance damage. While there may be some support for plaintiff's contention that he may have based his opinion, in part, on the effect the taking had in preventing the owner from pursuing its contemplated plan of development, his testimony indicated that he considered proper and relevant factors. . . ." (255 Cal.App.2d at p. 902.) The court applied the following rules: "Where it appears that the opinion of a valuation witness is

based wholly or chiefly upon improper considerations or incompetent and inadmissible matters, his testimony may be stricken. [Citations.] But where his opinion is based upon considerations which are proper as well as those which are not, the motion to strike may, in the sound exercise of the court's discretion, be denied and the matter left to the jury to determine the weight to be given the testimony. [Citations.]" (*Id.*)

 At the time the plan and the model were received in evidence the city objected "on the basis of the evidence of value based upon a specific use or owner's projected plan of use is not admissible." In overruling the objection, the court observed, "The Jury will be properly instructed, if you will submit instructions along the line you have indicated, and I will see that they are properly instructed." The city proffered instructions to the effect that the market value was not affected by special use, by the owner's contemplated use, or by a use that was not economically feasible, or by a non-permitted use for which there was no reasonable probability of rezoning; and that the church could not recover damages for injury to activities conducted by the church on the property except insofar as such injuries were reflected in a decrease of the market value of the property. More specifically, the city requested an instruction defining the use of illustrations and studies of adaptability.[3] The court refused these instructions on the grounds the subject matter was covered by instructions found in BAJI (California Jury Instructions, Civil (4th rev.ed. 1957) 1967 Cumulative Pocket Parts) Part VI, Instruction Nos. 501 et seq. (Cf. 5th ed. 1969, ch. 11, div. C, Inst. Nos. 11.70 et seq.) The city contends it was reversible error to refuse its instruction, and to fail to otherwise explain the limited use for which the plan and model could be used.

An examination of the instructions given reveals that the court gave instructions predicated on BAJI (*op.cit.*) Instructions Nos. 501, 501-A,

---

[3]This instruction, predicated on *People* v. *Chevalier* (1959) 52 Cal.2d 299 [340 P.2d 598], read: "The Court permitted the defendant to introduce evidence in the form of an artist's illustration or studies which purported to show only adaptability, if at all, of the defendant's property for the purposes of this trial and not as a plan for the development of the property. In this connection, you are specifically instructed that this evidence was admitted by the Court for the limited purpose of permitting the witness to illustrate his opinion of the adaptability of the property, if at all, for the uses and purposes which he expressed and had in mind, and as illustrative that such a study was merely feasible under his opinion of value. This does not mean, nor are you to infer from the evidence, that the defendant is entitled to a higher market value for its property under changed or altered circumstances which are merely possible, or under a study for the development of such property for a specific type of use or purpose which is merely possible. The fact, even if it be a fact, that the defendant was prevented from carrying out a plan for the development of its property, however much a disappointment, can add nothing in the eyes of the law to the fair market value of the same."

502, 502-A, 502-B, 502-D,[4] 502-G, 503 (Rev.),[5] 504 Alternate (new) Paragraphs (1), (2), (3), (6) and (7),[6] 506, 506-A,[7] 509 and 510. The instructions given, particularly those which have been set forth in the footnotes, generally cover the issues raised by the city's proffered instructions. In view of the controversy over the admission of the plan and the model the trial court would have been well advised to elaborate upon the general principles enunciated in those quoted instructions. (Cf. fn. 3 with fns. 4, 5, 6 and 7; and see *People* v. *LaMacchia, supra,* 41 Cal.2d 738, 752.) Nevertheless, with respect to severance damages the jurors were told, "Merely rendering private property less desirable for certain purposes or

---

[4]This instruction read: "The subject property may not be valued with reference to what it was worth to the defendant for speculation or merely for possible uses, nor what the defendant claims it was worth to it; nor what it may be worth to the plaintiff for the purpose for which it is being acquired."

[5]This instruction provided in part: "You must determine the fair market value of the subject property and the severance damage, if any, only from the opinions of the witnesses who have been permitted by the court to express their opinion of such market value and severance damage, if any. . . . Evidence which has been received from witnesses as to the reasons for their respective opinions of value, and all other evidence concerning the subject property and other properties, including your view of it, is to be considered by you only for the limited purpose of enabling you to understand and weigh the testimony of the witnesses as to their opinion of such market value and severance damage, if any."

[6]This instruction provided in part: "Certain matters may be considered by a witness in forming his opinion of the fair market value of the subject property and severance damage—if any, and if evidence of such matters has been received it may be considered by you only for the limited purpose of enabling you to understand and weigh the testimony of the witnesses as to their opinion of the fair market value of the subject property and severance damage, if any.

"Among these matters are: (1) The area and location of the subject property; the nature of its developments; the uses for which it is adaptable and available; its proximity to nearby shopping areas and commercial facilities; the availability of public transportation; the availability of utilities; the zoning of the subject property and any limitations placed upon its use by existing zoning laws. . . . (4) A witness may also consider the value of the property being valued as indicated by the value of the land together with the cost of replacing or reproducing the existing improvements thereon, if the improvements enhance the value of the property or property interest for its highest and best use, less whatever depreciation or obsolescence the improvements have suffered. [Cf. fn. 1, above] . . . As you have been previously instructed, you may consider evidence of any of the foregoing matters only for the purpose of enabling you to understand and weigh the testimony of the witnesses as to their opinions of market value and severance damage, if any."

[7]This instruction reads: "In assessing the damage, if any, which may accrue to the defendant's remaining property by reason of the taking and the construction of the proposed improvement, you must not consider anything as tending to depreciate such market value which is uncertain, remote, speculative or imaginary. The damage for which compensation is to be made is a damage to the property itself, and does not include a mere infringement of the owner's personal pleasure or enjoyment. Merely rendering private property less desirable for certain purposes or even causing personal annoyance or discomfort in its use does not constitute the damage contemplated by law, but the property itself must suffer some diminution in substance, or be rendered intrinsically less valuable by reason of the public use."

even causing personal annoyance or discomfort in its use does not constitute the damage contemplated by law, but the property itself must suffer some diminution in substance, to be rendered intrinsically less valuable by reason of the public use." "It must be assumed that the jury understood such clear and unambiguous language and correctly applied the instructions to the evidence. [Citations.]" (*People* v. *LaMacchia, supra,* 41 Cal.2d at p. 752.)

█ "The law is clear that instructions on points which have been sufficiently covered by other instructions may properly be refused although they are correctly drawn and applicable to the evidence. [Citations.] 'A party is not entitled to have the jury instructed in any particular phraseology, and may not complain on the ground that his requested instructions are refused if the court, of its own motion or otherwise, correctly announced the substance of the law applicable to the case. [Citation.]' (*Luis* v. *Cavin* (1948) 88 Cal.App.2d 107, 115 . . .)" (*People* ex rel. *Dept. of Public Works* v. *Wasserman* (1966) 240 Cal.App.2d 716, 736 [50 Cal.Rptr. 95].) █ No reversible error can be predicated upon the failure to give further instructions concerning the controversial evidence.

█ The city further cogently argues that the pace of actual development of the site between 1957 when the plan was drawn and 1965, the diminished size and the location of the chapel actually constructed in 1963, the failure to construct planned accessory buildings, the actual size of the congregation and its rate of growth, and regulations governing the use of the land, all demonstrate that the layout on the plan was impractical, unfeasible and without the realism of legal and financial possibility, and that it did not therefore accurately represent the needs of the church. The weight to be given these facts and the other evidence before them, including the testimony outlined above, was the province of the trier of fact. (See *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 903.)

█ Finally, the city complains that the award of $47,000 severance damages indicates that the jury must have indulged in speculation and conjecture because there is no testimony relating to that figure (see Appendix, below), and no formula for computing damages was suggested which would produce it. In *People* v. *LaMacchia, supra,* the court recognized the duty of the jury to reconcile conflicting testimony. The opinion states: "Next, the state maintains that it was error to instruct the jury 'if possible, to reconcile the conflicting testimony and to give it all due weight.' The state argues that in view of the wide discrepancy in the estimates of value and damage by witnesses for the respective sides, it is clear that the opinions were irreconcilably conflicting, and the effect of the instruction was to tell the jury to 'cut somewhere in between' divergent

amounts. However, 'Upon the trier of fact rests the responsibility to reconcile, if possible, any apparent conflict, whether the same arises upon the entire case or in the testimony of a single witness, and to effectuate all the evidence, when the nature of the case will admit of such a disposition.' (*Darling* v. *Pacific Elec. Ry. Co.,* 197 Cal. 702, 708 . . .)" (41 Cal.2d at pp. 753-754.) In this case the jurors after viewing the premises and hearing all the testimony may have determined that the property was not desirable for church purposes after the taking, but that the improvements which would be lost were not as valuable as the church contended; or they may have determined that the property could be used for church purposes after the taking, but would have a depreciated market value because any expansion would lead to crowded conditions.

*Sufficiency of the Evidence*

The evidence has been reviewed at length in connection with the city's attack on its admissibility. If believed by the jury there was adequate evidence to support the verdict as predicated on the finding that the remainder of the property was no longer usable for church purposes, and the church was entitled to recoup the value of its then valueless improvements.

The fact that the jurors returned severance damages at a figure roughly half of that testified to by the church's witnesses does not invalidate the verdict. In *People* ex rel. *Dept. Public Works* v. *Jarvis* (1969) 274 Cal. App.2d 217 [79 Cal.Rptr. 175], the court observed, "Each witness calculated his respective lump-sum figure from several opinion factors of his own, including different per-acre values and acreage figures assigned by him to various areas of the Jarvis ranch both before and after the condemnation (see fn. 4, *ante*). The differences among these factors presented conflicts in the evidence; these were for the jury to resolve (*People* v. *Hayward Bldg. Materials Co.* (1963) 213 Cal.App.2d 457, 467 . . .), aided by its independent view of the premises. (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 738-739 . . .) The range limiting its severance-damage figure ran up to the highest valid arithmetical combination of factors selected from the testimony of all the witnesses; any verdict less than such highest possible figure was—as this one was—'shown by the testimony of the witnesses' (*People* ex rel. *Dept. of Public Works* v. *McCullough, supra,* 100 Cal.App.2d 101 at p. 105 [223 P.2d 37]; *Redevelopment Agency* v. *Modell, supra,* 177 Cal.App.2d 321, 326-327 [2 Cal.Rptr. 245]) and, hence, supported by the evidence." (274 Cal. App.2d at p. 227. In addition to the cases cited see, *People* v. *Thompson* (1954) 43 Cal.2d 13, 27-28 [271 P.2d 507]; *State of Cal.* ex

rel. *Dept. of Water Resources* v. *Natomas Co.* (1966) 239 Cal.App.2d 547, 560 [49 Cal.Rptr. 64]; *City of Gilroy* v. *Filice* (1963) 221 Cal. App.2d 259, 272-273 [34 Cal.Rptr. 368]; and *People* ex rel. *Dept. of Public Works* v. *Pera* (1961) 190 Cal.App.2d 497, 501 [12 Cal.Rptr. 129].)

The city's attack on the qualifications of the witnesses called by the church, and the foundation for their opinions raises factors properly to be considered by the jury. "The credibility of the witnesses and the weight to be accorded the evidence are matters within the exclusive province of the trial court . . . Differences in the valuation testimony in the instant case represented merely a conflict in the evidence. . . . It was the exclusive province of the trial court to weigh such evidence and to determine the amount of compensation within the range of such testimony. . . . This disposes of plaintiff's additional complaint that the court did not accept (although it did receive) the valuation testimony of plaintiff's expert and the evidence relating to sales to plaintiff of similar sewer easements, on which such expert in part based his opinion. It is apparent that the trial court weighed all of the valuation evidence and determined an award within the range of plaintiff's witness ($1.00) and defendant's ($2,250). This was properly within the range of values. . . ." (*City of Gilroy* v. *Filice, supra,* 221 Cal.App.2d 259, 272-273, citations omitted.)

*Testimony of the Pastor of the Church*

In addition to testifying concerning church needs in general, and the needs and programs of his particular church, Pastor Myrant was permitted to testify, over the city's objection, that in his opinion there was no market for used churches; that the fair market value of the land owned by the church was approximately $1.50 per square foot; that the value of the area taken was $39,000; that the value of the sanctuary was $18 per square foot for a total of $47,340, and the value of the accessory buildings was $14 per square foot for a total of $33,350; that no reduction in value for depreciation was necessary; and that permanent fixtures of a value of $3,666 would be lost in connection with moving the church to another location. He subsequently opined that the total damage to the church was $125,256, although he correctly totaled his former figures on a work sheet at $123,256.

In overruling the city's objection that no foundation had been shown to qualify the pastor as an expert witness, the court observed, "It isn't needed where the owner is testifying. The owner is entitled to state his opinion and I suppose that Reverend Myrant is speaking for the owner. Someone has to. Someone is entitled to. It will be overruled on that basis. I agree there is no foundation, no adequate foundation, along the classical lines, but I think it is permittable on that basis." Subsequently the court instructed the jury,

"An expert appraiser or *the owner* of the property being condemned or any witness who has knowledge of the market value of the subject property may give his opinion of such market value and severance damage, if any, and the reasons for such opinion." (Italics added.) The court erred in so ruling.

■ Under the law of this state the owner of the property or property interest being valued may testify as to his opinion of the value in issue. (Evid. Code, § 813, subd. (a) (2); and see *People* v. *LaMacchia, supra,* 41 Cal.2d 738, 746; *Long Beach City High School Dist.* v. *Stewart* (1947) 30 Cal.2d 763, 772 [185 P.2d 585, 173 A.L.R. 249]; *Spring Valley Water Works* v. *Drinkhouse, supra,* 92 Cal. 528, 534-535; *Los Angeles City High School Dist.* v. *Rodriquez* (1955) 135 Cal.App.2d 760, 765 [287 P.2d 871]; and *People* v. *Jones, supra,* 67 Cal.App.2d 531, 537.) The rule was originally predicated on the theory that the owner who resided on and owned property for a period of years would be presumed to acquire sufficient knowledge of the property and of the value of the land in that neighborhood to be able to give an intelligent estimate as to the value of his own property. (*Spring Valley Water Works* v. *Drinkhouse, supra,* 92 Cal. at p. 535. See also, 5 Nichols, Eminent Domain (3d ed. rev. 1962) § 184[2], pp. 198-202; and 1 Orgel, Valuation Under the Law of Eminent Domain (2d ed. 1953.) § 132, p. 567.) With the adoption of the Evidence Code, the rule was codified. (Evid. Code, § 813 subd. (a)(2); Stats. 1965, ch. 1151, § 4, p. 2904, operative July 1, 1967.[8])

Generally, however, an officer of a corporate owner is not qualified to testify unless he is otherwise qualified. In *First Baptist Church* v. *State Dept. of Roads* (1965) 178 Neb. 831 [135 N.W.2d 756], the court reversed a condemnation award in an action in which members of the church, one of whom had been an officer, had been permitted to testify as to value. The court ruled, "Membership in the church does not bring these witnesses into a relationship with the property so they may testify as to valuation without foundation. An officer or president of a corporation is not an owner of property belonging to the corporation in the sense of the word when applied to an individual owner. There is no presumption in his favor as in the case of an individual owning property, and in order to qualify he must be shown to be familiar with the property and have such a knowledge as to qualify him to testify because of his knowledge of values generally in

[8]For the legislative history preceding the adoption of the statutory provision see Recommendation and Study Relating to Evidence in Eminent Domain Proceedings, California Law Revision Commission, October 1960, page A-5, fn. 2 and pages A-8 to 9, text of proposed addition of section 1248.1, subdivision (b) to the Code of Civil Procedure; and Legislative History of Measures Introduced in 1961 Session on Recommendation of California Law Revision Commission, page 1, all as found in Volume 3 of the reports of the Commission. Compare, *Commonwealth, Dept. of Highways* v. *Fister* (Ky. 1963) 373 S.W.2d 720, 721-723 which abrogates the rule.

the vicinity. *Omaha Loan & Trust Co.* v. *Douglas County*, 62 Neb. 1 [86 N.W. 936]. We come to the conclusion that membership in the church does not qualify them to testify as to the value of the church without further foundation." (178 Neb. at p. 834 [135 N.W.2d at p. 758]. See also *State* ex rel. *State Highway Co.* v. *Assembly of God* (1962) 230 Or. 167, 177-178 [368 P.2d 937, 942]; *M. A. Realty Co.* v. *State Roads Com.* (1967) 247 Md. 522, 525-526 [233 A.2d 793, 795-796]; 5 Nichols, *op.cit.*, § 184[2], p. 202; and Annotations, Public or Corporate Officer as within rule that owner of property may testify to value thereof (1920) 5 A.L.R. 1171, (1926) 145 A.L.R. 1494. Cf. *Idaho-Western Ry. Co.* v. *Columbia etc. Synod* (1911) 20 Idaho 568, 574-576 [119 P. 60, 61-62].)[9]

■■■ The church predicates the propriety of the testimony on the following principle: "A witness who through knowledge and experience possesses the means to form an intelligent judgment as to the value of land beyond that possessed by persons generally is competent to give an opinion on fair market value even though he is not a real estate appraiser or broker. [Citations.]" (*San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 898. See also, *Pacific Gas & Elec. Co.* v. *Hufford* (1957) 49 Cal.2d 545, 563 [319 P.2d 1033]; *People* ex rel. *Dept. of Public Works* v. *Alexander* (1963) 212 Cal.App.2d 84, 90-91 [27 Cal.Rptr. 720]; *Los Angeles City High School Dist.* v. *Rodriquez, supra,* 135 Cal.App.2d 760, 766-769.) An agent or officer of a corporation may be so qualified. (See *F.X. Bilodeau Realty Inc.* v. *Lewiston Urban Renewal Authority* (Me. 1968) 237 A.2d 398, 399-400; and *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authority* (1956) 335 Mass. 189, 198 [138 N.E.2d 769, 775].) It is axiomatic that "[T]he qualification and competency of one offered as a valuation witness is a matter to be determined by the trial court and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. (*Pacific Gas & Elec. Co.* v. *Hufford, supra,* 49 Cal.2d 545, 563; *People* v. *Hayward Bldg. Materials Co.,* 213 Cal.App.2d 457, 471 . . .)" (*San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d at p. 899. In addition to cases cited see, *Los Angeles City High School Dist.* v. *Rodriquez, supra,* 135 Cal.App.2d at p. 765.) In this case, however, no such determination was made because the court permitted the testimony to be introduced on an erroneous theory. Nevertheless, in order to determine whether the city was prejudiced by this ruling it is necessary to examine the testimony of the pastor to determine whether the exclusion of his opinions,

---

[9]The fact that a corporation must conduct its affairs through agents, and that a question of privilege may arise when such an agent, if an appraiser, renders a report to the corporation attorney (see *People* ex rel. *Dept. of Public Works* v. *Glen Arms Estate, Inc.* (1964) 230 Cal.App.2d 841, 852-863 [41 Cal.Rptr. 303]), has no bearing on the qualification of any particular corporate officer or employee to give an opinion as to the market value of any corporate property.

on the basis of the qualifications he did express, would have been an abuse of discretion; and, if not, whether his testimony as to value was prejudicial in the light of all of the evidence in the case.

The pastor's testimony concerning his qualifications was as follows: While attending a theological seminary after graduating from Northwestern University he served as interim pastor of one church and as a teacher in a leadership capacity in another. The former position involved him in counseling and discussing the further development program of that church which then had one building on its site. Later he worked with the pastor of a newly formed church in discussing the building program and development of that church. As a teacher at a bible college he was involved in extensive search for properties for development of a school, and for developed properties to which the school could be moved. On later assignments he had similar experiences with development and building programs. He followed professional magazines to keep abreast of national trends and denominational programs on church building and site utilization. He participated in searching for sites for churches and church related schools and reviewed opportunities of purchase of other buildings that had previously been used as a church. He received a certain amount of instruction in these fields in practical courses during his schooling.

He did not come to Pleasant Hill until November 30, 1966, over a year after the date of the taking, September 29, 1965, which is applicable to the values in this case. He obtained a figure of $1.50 per square foot by discussing the value of the property with people who were interested because they had property in the area, and with members of the congregation, and by examining the general pattern of zoning and community development. He arrived at the figures for valuing the improvements on the basis of his participation in other building programs in the midwest, and information he had obtained that building costs were higher here than in the midwest. He was not familiar with the legal definition of fair market value or the rules for determining severance damages.

Although the foregoing testimony serves to qualify the witness to testify with respect to the spatial needs of the church, it is devoid of any general knowledge of the market value of real estate or of building costs in Pleasant Hill in September 1965. His opinions merely reflect the opinions of others and have no basis in factual knowledge of real estate sales or building costs. As stated in *First Baptist Church* v. *State Dept. of Roads, supra,* "There is no evidence that either Christensen or Hall were property owners. The theory on which the trial court received this evidence, over objection, was that these two witnesses were qualified in the same manner as owners, since they were members. This was error as we have seen. The lack of foundation otherwise is almost apparent. There is a total absence of testimony that they were familiar with real estate values; that they were informed as to the state

of the market; or that they kept track of sales or any other pertinent information usable as a basis for an intelligent estimate of value. Mere familiarity with the physical structure and location of the church does not automatically render them competent to testify as to value, nor does participation in the remodeling activities beginning 14 years prior to the taking furnish an adequate basis." (178 Neb. at pp. 835-836 [135 N.W.2d at p. 759]. See also *People* v. *Hayward Bldg. Materials Co.* (1963) 213 Cal.App.2d 457, 470-472 [28 Cal.Rptr. 782].) The evidence of the pastor's qualifications did not require the admission of his testimony as to value as a matter of law.

The prejudicial effect of the pastor's testimony must be evaluated in the light of the entire record and is considered below.

*View*

The city asserts that it was error to permit the jury to inspect the improvements on the land, as distinguished from viewing the land actually taken and its relation to the property remaining. Prior to the view, the following occurred: "THE COURT: May I ask if the scope of the view has been determined as yet. There was a question earlier this morning that was discussed. I think the Jury should have the right to see everything that's there. [Attorney for the Church]: That was our request, your Honor." The failure of the city to object at the time should preclude further complaint on appeal. (*Shields* v. *Oxnard Harbor Dist.* (1941) 46 Cal.App.2d 477, 489 [116 P.2d 121]; *City of Los Angeles* v. *Morris* (1925) 74 Cal.App. 473, 483 [421 P. 409]; and see *City of Riverside* v. *Kraft* (1962) 203 Cal.App. 2d 300, 301-302 [21 Cal.Rptr. 425].)

"The question as to whether the jury should be permitted to view the premises is a matter within the discretion of the trial judge. [Citations.]" (*County of Los Angeles* v. *Pan American Dev. Corp.* (1956) 146 Cal.App.2d 15, 20 [303 P.2d 61]. See also, *City of Riverside* v. *Kraft, supra,* 203 Cal.App.2d 300, 301; *Shields* v. *Oxnard Harbor Dist., supra,* 46 Cal.App.2d 477, 488-489; Evid. Code, § 813, subd. (b); and Code Civ. Proc., 610. Cf. *People* ex rel. *Dept. Public Works* v. *Arthofer* (1966) 245 Cal.App.2d 454, 469 [54 Cal.Rptr. 878].) Since the church relied upon the special purpose rule (see fn. 1, above), and the experts relied upon reproduction costs as an element of value, no abuse of discretion has been shown. Nor was there any error in instructing the jurors that what they saw and the knowledge they acquired as a result of their visit was independent evidence in the case and should be considered by them, together with all of the other evidence in the case in arriving at their verdict. (See *San Francisco Bay Area Rapid Transit Dist.* v. *Central Valley Nat. Bank* (1968) 265 Cal.App.2d 551, 555 [71 Cal.Rptr. 430].)

*Evidence of Comparable Sales*

The church's first qualified expert testified concerning his qualifications and launched into a description of the factors considered in his valuation of the property involved in this case. When the attorney for the city requested permission to examine on *voir dire* with respect to the witness's testimony regarding comparable sales, the proceedings were recessed out of the presence of the jury. The city then objected to one of the comparable sales offered on the ground that it was too remote in distance from the subject property, and to a second because there was no showing that there was a reasonable possibility that the subject property could have been rezoned for multiple use in the manner of the property to which the witness referred. The witness testified that he had discussed the matter of rezoning with a co-owner[10] of nearby property who had purchased the property, had it rezoned and sold a portion. He acknowledged that he had not discussed the matter with the planning commission, or the city council, or officially with any officer of the city; and stated that his conclusion that the property could be rezoned was based on inference from what had been done. He had previously testified on direct examination that the master plan of the city showed low or medium density multiple family uses for the area, and subsequently he repeated before the jury his testimony concerning the rezoning of the other property, and acknowledged on cross-examination that he had not checked with the planning commission or the city council. The jury was instructed as to the limited purposes for which evidence of comparable sales was received, the manner in which such testimony should be evaluated, and the effect of a reasonable probability of a change in zoning restrictions. (See BAJI, *op.cit.,* Instruction No. 504 Alternate (new), particularly pars. (3) and (7), fn. 6 above.)

The general qualifications governing the use of evidence of comparable sales, and the rule for review of the action of the trial court in ruling on the admission of such evidence were first phrased as follows: "The sales of the other tracts must have been sufficiently near in time, and the other land must be located sufficiently near to land to be valued, and must be sufficiently alike in respect to character, situation, usability, and improvements, to make it clear that the two tracts are comparable in value and that the price realized for the other land may fairly be considered as shedding light on the value of the land in question. Manifestly, the trial judge in applying so vague a standard must be granted a wide discretion." (*County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 678 [312 P.2d 680]. See also, Evid. Code, § 816; *San Bernardino County Flood Control*

[10]This informant was later identified as the Mayor of Pleasant Hill. The parties discretely refrained from exploring the ramifications of the transaction involved on the court's instructions to avoid collateral issues.

*Dist.* v. *Sweet, supra,* 255 Cal.App.2d 889, 905; *People* ex rel. *Dept. Public Works* v. *Arthofer, supra,* 245 Cal.App.2d 454, 463; *People* ex rel. *Dept. Public Works* v. *Auburn Ski Club* (1966) 241 Cal.App.2d 781, 783-786 [50 Cal.Rptr. 859]; *People* ex rel. *Dept. Public Works* v. *Silveira, supra,* 236 Cal.App.2d 604, 622-624; *People* ex rel. *Dept. Public Works* v. *Kawamoto* (1964) 230 Cal.App.2d 18, 21 [40 Cal.Rptr. 85]; *Buena Park School Dist.* v. *Metrim Corp.* (1959) 176 Cal.App.2d 255, 259 [1 Cal.Rptr. 250]; *Covina Union High School Dist.* v. *Jobe* (1959) 174 Cal.App.2d 340, 349-350 [345 P.2d 78]; and cf. *People* ex rel. *State Park Com.* v. *Johnson, supra,* 203 Cal.App.2d 712, 718-720.)

▆ The record reveals that the "distant" sale was within one mile of the subject property. Under these circumstances there was no abuse of discretion in permitting reference to this sale with opportunity for cross-examination to show that it involved property in another city and whatever effect that factor would have on its value. (See *San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App.2d at p. 905.)

▆ "Where there is a reasonable probability that zoning restrictions will be altered in the near future, the jury should consider not only those uses currently permitted, but also other uses to which the property could be devoted in the event of such a change. [Citation.]" (*People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352 [19 Cal. Rptr. 473, 369 P.2d 1]. See also, *People* v. *Dunn* (1956) 46 Cal.2d 639, 642 [297 P.2d 964]; *People* ex rel. *Dept. Public Works* v. *Arthofer, supra,* 245 Cal.App.2d 454, 462-463.) ▆ "The reasonable probability of a zoning change may be shown by a variety of factors, including neighborhood changes and general changes in land use." (*People* ex rel. *Dept. of Public Works* v. *Donovan, supra,* 57 Cal.2d at p. 353.) ▆ It is questionable whether an inference predicated on the rezoning of one parcel would constitute sufficient foundation to qualify the witness to express an opinion as to the reasonable probability of a zone change. A ruling excluding such testimony might well have been no abuse of discretion. (See, *People* ex rel. *Dept. Public Works* v. *Arthofer, supra,* 245 Cal.App. 2d at pp. 463-466.) In this case it is unnecessary to pursue the matter because of lack of prejudice to the city. Each of its expert witnesses opined that he considered the value of the property if used for multiple dwelling purposes after familiarizing himself with the zoning in the general area of the subject property. Witness Orr expressly testified, "The subject property was zoned for single family and it did have the probability of being zoned to multiple residential units."

▆ The city also asserts that not only was evidence of the comparable sales alluded to by the church's witness Johnson incompetent because

not comparable,[11] but also, that other testimony elicited from that witness on cross-examination,[12] demonstrated that the witness was not qualified to express an opinion on the value of the land or on the cost of reproduction of the improvements. There was no objection to any of this testimony (as distinguished from the objection to the testimony of the witness as to the usability of the premises for church purposes after the taking), nor did the city make any motion to strike. The sole objection in the record appears when the court properly cut short the city's *voir dire* examination as to the witness's qualifications on the grounds that it was transgressing into the field of cross-examination. On this record no objection can be considered at this stage of the proceedings. Furthermore, the testimony adduced appears to fall within the principles set forth above governing the range of the court's discretion, both with respect to the qualification of the witness as competent to express an opinion as to value, and in relation to the relevancy and competency of the evidence of comparable sales. The city's contentions go to the weight rather than the competency of the evidence.

*Admission by Prior Answer*

In its original answer filed November 18, 1965, and verified by the chairman of its board of trustees, the church alleged severance damages of $15,000. By interlineation the answer was amended to claim severance damages of $100,000. According to the city this amendment was made in 1967 after the church had substituted new counsel in the case. The city offered to read the superseded answer in evidence. The attorney for the church objected on the ground that the evidence was not material and represented to the court that the answer was filed without the benefit of an appraisal. The court accepted the attorney's statement on the basis of what the experts who had testified had stated as the time of their initial investigation of the case, and sustained the objection on the grounds that it would open up collateral issues. (See, *People* ex rel. *Dept. Public Works* v. *Miller* (1964) 231 Cal.App.2d 130, 133-134 [41 Cal.Rptr. 645].)

Prior to the adoption of the Evidence Code the following rule governed the use of an admission in a superseded pleading: "It is generally recognized, however, that a superseded pleading may be given some evidentiary effect, although the courts are not in accord as to the circum-

---

[11]This evidence was reference to a sale of a single family residence at a price of $2.16 a square foot including improvements, and to a sale of unimproved property acquired at 40 cents a square foot for 95 cents a square foot after rezoning (see fn. 10 above and accompanying text). The witness testified to a value of $1.50 per square foot for the land alone in subject property.

[12]The witness acknowledged with respect to his opinion of replacement cost that he did not apply any depreciation to his cost figures. He stated, "I understood that I would take the 1955 construction costs. Now what this is is costs I have run into in other churches and 40 to 50 cents per square foot is the figure that I used," and "I don't attest to be a certified appraiser."

stances under which it may be considered. . . . By a long line of decisions, it is established in this state that such a pleading is not admissible as direct evidence to establish a fact in issue. . . . The reason for this view is that the use of superseded pleadings to such extent as to embarrass the amending party is in derogation of the policy of liberality in permitting amendments to pleadings. . . . However, where the party has testified in the action, a superseded pleading may be offered for the purpose of impeachment. . . ." (Citations and footnote omitted.) (*Meyer* v. *State Board of Equalization* (1954) 42 Cal.2d 376, 384-385 [267 P.2d 257]. See also, *Walter J. Warren Ins. Agency* v. *Surpur Timber Co.* (1967) 250 Cal.App. 2d 99, 106-107 [58 Cal.Rptr. 143]; *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 383-384 [25 Cal.Rptr. 301]; and *Lerner* v. *Glickfeld* (1960) 187 Cal.App.2d 514, 527 [9 Cal.Rptr. 686].)

Under these rules the superseded allegation could only have been used for impeachment purposes. (See, *Cahill Bros., Inc.,* v. *Clementina Co., supra,* 208 Cal.App.2d at p. 384; and *Lerner* v. *Glickfeld, supra,* 187 Cal.App.2d at p. 527.) Mr. Batz, the chairman of the board of trustees who verified the original complaint, was not called as a witness although the record reveals that he purchased a residence to the rear of the church property in 1963. ■■■ No attempt was made to use the original allegation to impeach the pastor or other members of the congregation who did testify, so it is unnecessary to determine whether such use would have been proper.

It has been suggested that since section 1235 of the Evidence Code provides that prior inconsistent statements are admissible as substantive evidence (at least in civil actions, cf. *People* v. *Johnson* (1968) 68 Cal.2d 646, 660 [68 Cal.Rptr. 599, 441 P.2d 111]), the rule of the *Meyer* case "has lost its significance; and unless the courts should decide to exclude it altogether, the superseded pleading will have evidentiary effect." (Witkin, Cal. Evidence (2d ed. 1966) § 502, p. 473.) There is no necessity to consider the propeiety of this analysis because the hearsay exception established by section 1235 only applies when the person whose statement is to be used is a witness and has an opportunity to explain or to deny the statement. (Evid. Code, § 770.)

■■■ Generally a party's extrajudicial statement as to value is admissible as substantive proof where value is in issue. (*Nelson* v. *Fernando Nelsen & Sons* (1936) 5 Cal.2d 511, 518 [55 P.2d 859] [values in application for bank loan]; *Fairchild etc. Co.* v. *Southern etc. Co.* (1910) 158 Cal. 264, 271 [110 P. 951] [written offer to sell at a fixed price per ton]; *Sill Properties, Inc.* v. *GMAG, Inc.* (1963) 219 Cal.App.2d 42, 54-55 [33 Cal.Rptr. 155] [corporate resolution setting forth value of assets]; *Bank of Italy etc. Assn.* v. *Johnson* (1935) 7 Cal.App.2d 463, 464-465

[46 P.2d 244 [statement of value of assets in letter]; and see *Webb* v. *Standard Oil Co.* (1957) 49 Cal.2d 509, 512 [319 P.2d 621] [tax return setting forth claim of deductible loss excluded as privileged].) The city claimed that the church's assertions that the remaining property was inadequate for church purposes, and, more specifically, insufficient for the purposes of the condemnee church, were unwarranted and of recent contrivance. The declaration made November 16, 1965 was material and relevant on this issue. A claim of $15,000 was inconsistent with the claim that the church's damages should be measured by the value of all the improvements because they were no longer usable or of value for church purposes. Nevertheless, the existing precedents uphold the exclusion of the evidence.

It may be pointed out that the rule in the *Meyer* case does not represent prevailing authority. (4 Wigmore, Evidence (3d ed. 1940), § 1067, pp. 61-65; McCormick, Evidence (1954) § 242, p. 510; Witkin, *op.cit.*) The reasons for the rule, and the Massachusetts case (*Taft* v. *Fiske* (1885) 140 Mass. 250 [5 N.E. 621, 54 Am.Rep. 459]) on which it is based, are completely eviscerated in Wigmore's discussion. The policy of liberality in permitting amendments to pleadings enables the litigant to change horses in the middle of the stream, but it should not relieve him of the burden of showing why it was necessary to do so. There is no such protection for the other declarations alluded to above, nor, for that matter to a declaration in a pleading filed in another contemporaneous action involving the same accident. (*Dolinar* v. *Pedone* (1944) 63 Cal.App.2d 169, 176-178 [146 P.2d 237]; and see, *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 706-713 [39 Cal.Rptr. 64] [admissions in notice of appeal filed in administrative proceedings].) The trier of fact should be entitled to weigh the declaration and any evidence offered by the party in explanation to show that it was unauthorized, made inadvertently or under mistake of fact, or upon inadequate knowledge. (See, *Caccamo* v. *Swanston* (1949) 94 Cal.App.2d 957, 969 [212 P.2d 246] [noted but not overruled in *Meyer, supra,* 42 Cal.2d at p. 385]; *Lowmiller* v. *Monroe, Lyon & Miller, Inc.* (1929) 101 Cal.App. 147, 152 [281 P. 433, 282 P. 537] [disapproved in *Meyer, supra,* 42 Cal.2d at p. 384, fn. 3]; and Schauer, J., Shenk, J. and Carter, J. dissenting in *Meyer, supra,* 42 Cal.2d at pp. 396-397.)

The adoption of the Evidence Code (see Evid. Code, § 2) and the fact that *Meyer,* as an alternative ground of decision, noted that there was not, as in this case, an attempt to introduce the superseded pleading in evidence (42 Cal.2d at p. 386; and see Wigmore, *op.cit.*), offer an opportunity to review the probity of the rule of *Meyer* and its effect on the ascertainment of the truth. The Law Revision Commission Comment that "Section 1220 states existing law as found in subdivision 2 of Section 1870 of the Code of

Civil Procedure" (Deering, Evid. Code Annotated, comment following §1220), and the application of the rule of *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], constrains this court from taking such action. The exclusionary ruling of the trial court must be approved.

*Availability of Adjacent Property*

The city asked the pastor, "Now do you know of any efforts by the church to acquire other property." His answer, "There has been, to my knowledge, discussion with neighbors who . . ." was interrupted by an objection.[13] Out of the presence of the jury the city made the following offer of proof: "We would like to show that the church has made an offer to purchase an adjacent piece of property directly to the south . . . behind the multi-parcel which fronts on Cleveland Road . . . To show the church is not damaged, that there is no severance damage. . . . I can only urge, your Honor, that I think it rebuts [*sic*] their testimony that those buildings, the value of those buildings has been destroyed."

The court refused to permit the city to explore the matter set forth in its offer of proof, it observed, "You could, on your own, I think, bring in whether other properties are available in the area, something of that kind, but I don't see the fact that an offer has been made to buy the property—if it was accepted and there was an option on it or something like that, it might be different, but mere inquiry of that kind is too remote."

The church blithely overlooks the purpose for which the evidence was offered, and the city's express disclaimer that it would show the amount of the offer. It defends the ruling of the court on the principle that the price at which an offer to purchase property has been made is inadmissible as evidence and is not a proper basis for an opinion as to the value of property. (Evid. Code, § 822, subd. (b); *City of Santa Cruz* v. *Wood* (1967) 252 Cal.App.2d 52, 53-55 [60 Cal.Rptr. 26]; *Los Angeles City High School Dist.* v. *Kita* (1959) 169 Cal.App.2d 655, 663 [338 P.2d 60]; 5 Nichols, *op.cit.*, § 214[3], pp. 488-492; 3 Cal. Law Revision Com. Rep., pp. A-7 and A-8.) The city designedly or unwittingly was venturing into the field of "cost to cure," as related to severance damages. (See *People* ex rel. *Dept. Public Works* v. *Flintkote Co.* (1968) 264 Cal.App.2d 97, 106 [70 Cal.Rptr. 27]; *County of Santa Clara* v. *Curtner* (1966) 245 Cal.App.2d 730, 743-744 [54

---

[13]One objection advanced by the church was predicated on the fact that at the outset of the second day of trial, its attorney questioned the right of the city to contend that the church owned or had the right to purchase additional property adjacent to the remainder, and that he was then assured that the city had no such intention. At the hearing on the offer of proof three days later, the city represented that it had just learned about the church's offer for the adjoining property.

Cal.Rptr. 257]; *People* v. *Hayward Bldg. Materials Co.* (1963) 213 Cal.App.2d 457, 465-467 [28 Cal.Rptr. 782]; *City of Riverside* v. *Kraft, supra,* 203 Cal.App.2d 300, 302-305; and *Steiger* v. *City of San Diego* (1958) 163 Cal.App.2d 110, 117-118 [329 P.2d 94]; and 5 Nichols, *op.cit.,* § 23.1, pp. 527-528 and 23.2, pp. 537-538.)

Cases collected on the question of minimizing of damages (see 4 Nichols, *op.cit.,* § 14.22, pp. 520-528, particularly fns. 1 and 5) are not consistent on the question of whether the availability of adjacent land can be considered in determining whether the taking of a portion of the con-demnee's property renders it valueless or less valuable for the uses to which it was originally adaptable. In *Department of Highways* v. *Intermountain Terminal Co.* (1967) 164 Colo. 354 [435 P.2d 391], it was established that the taking had rendered the remainder of the property originally owned and improved as a truck terminal insufficient and useless for truck terminal operations of a major motor carrier, and the damages to the portion of the original tract not taken were ascertained accordingly. Ten days after the proceedings in condemnation were filed the condemnee acquired adjacent property and proceeded to adapt it for use with the remainder of the original parcel. The condemnor asserted "that the other property purchased . . . should be considered as a part of the tract which was damaged by the condemnation proceedings, to decrease the amount payable by reason of diminution in the market value of the residue." The court ruled, "P.I.E. was not required by law to expend a large sum of money to avoid the consequences of the predicament in which the Depart-ment of Highways placed it through the expropriation proceedings. The business acumen of P.I.E. in the discovery of the opportunity to buy other property and the expenditure by it of $260,000 for acquiring such property with a subsequent sale of a part of it should not inure to the benefit of the Department of Highways. This 'other property' was not damaged by the condemnation proceedings and, therefore, was not residual property." (164 Colo. at p. 359 [435 P.2d at p. 393].)

On the other hand, in *State* v. *Cooperative Security Corp. of Church* (1952) 122 Utah 134 [247 P.2d 269], the court reversed a judgment awarding severance damages on the theory that the property owner's farm was a unit operation and the taking of 7.89 acres and cutting off of two small tracts of 3.28 acres and 1.21 acres, respectively of pasture out of a total of 131.79 acres used as a dairy farm, impaired the value of the whole by at least 20 percent. The court ruled, "If similar land to that taken was available on the date the summons was served, which could have been substituted for that condemned, it cannot be contended that the entire project was depreciated in value because it was made economically unfeasable because of lack of pasture land to graze a minimum number of dairy cattle. Under such a state of the record the opinion of experts as to the

amounts the project was damaged was wholly immaterial and irrelevant." (122 Utah at p. 139 [247 P.2d at p. 272]. See also, *Provo River Water Users' Assn. v. Carlson* (1943) 103 Utah 93, 102-103 [133 P.2d 777, 781]; and cf. *State, Road Com. v. Style-Crete, Inc.* (1968) 20 Utah 2d 365, 367-368 [438 P.2d 537, 539]; *State v. Howes* (1968) 20 Utah 2d 246, 247 [436 P.2d 803, 804]; and *Southern Pac. Co. v. Arthur* (1960) 10 Utah 2d 306, 311-312 [352 P.2d 693, 697] in which the rule was recognized but found inapplicable under circumstances.)

The condemnee has been permitted to show the cost or necessity of acquiring adjacent land for expansion as an element entering into the depreciation in value of the remainder, where the taking has reduced the adaptability of the land for its most advantageous use. In *Edgcomb Steel of New England, Inc. v. State* (1957) 100 N.H. 480 [131 A.2d 70], the court observed: ". . . it could be found that the taking posed for plaintiff the question of whether to seek a wholly new location, or to partially expand within the area remaining to the west, seeking additional space elsewhere, or to plan its entire expansion as a unit to the north." (100 N.H. at pp. 487-488 [131 A.2d at p. 77].) The court ruled, "The State as condemnor was not necessarily to be held liable for damages upon the theory that the value of what remained after condemnation was substantially reduced because it was no longer usable for the purpose for which it was designed. If by provision for expansion in another direction the most advantageous use of the plaintiff's land could still be preserved, its value was to be determined in the light of that prospect. *Barker v. Publishers' Paper Co.,* 78 N.H. 571, 575 [103 A. 757, L.R.A.1918E 709], and cases cited. 4 Nichols, Eminent Domain, (3d ed.), § 14.22. The evidence relating to the feasibility of expanding to the north in order to effect the most advantageous use of the part not taken was proper to be considered by the jury in determining the value of what remained. The prospect of using the building to its fullest advantage by constructing additional warehouse space to the north might be found at the time of the taking 'to have probably affected the public mind, and therefore to have enhanced the price which a purchaser might be expected to give.' *Emmons v. Utilities Power Co., supra,* 83 N.H. 181, 185 [141 A. 65, 68] for the holdings not condemned. The fact that the plaintiff acquired the land to the north for that very purpose served to demonstrate the reality of the prospect." (*Id.,* at p. 488 [*id.,* at p. 77]. See also, *City of St. Louis v. Paramount Shoe Mfg. Co.* (1943) 237 Mo.App. 200, 218 [168 S.W.2d 149, 156].)

On analysis other cases which appear to restrict showing that loss of the highest and best use of the land can be prevented by the acquisition of adjacent land rest on the nature of the evidence or offer of proof. In *State Highway Dept. v. Thomas* (1967) 115 Ga.App. 372 [154 S.E.2d 812]

proof that it was physically possible to relocate the condemned portion of the condemnee-lessee's golf course onto other parts of the condemnee-lessor's land was properly excluded in the absence of any showing that the property would be made available to the lessee. (115 Ga.App. at pp. 379-380 [154 S.E.2d at pp. 817-818].) In *State* v. *Herman* (Mo. 1966) 405 S.W.2d 904, the trial court rejected the condemning authority's offer to prove that the landowner had been offered the right to purchase a right of way, in order to contradict the latter's claim that his remaining property was landlocked. The court upheld the ruling because the condemnor had not conceded liability for the costs of improvement, in addition to the cost of acquisition of the right of way, because the jury's award was approximately in the aggregate of those sums, and because the proof of the offer was inadequate to establish that the landowner could have in fact acquired the property right. (405 S.W.2d at pp. 908-909. See also, *Cornell-Andrews Smelting Co.* v. *Boston & P. R. Corp.* (1909) 202 Mass. 585, 599-600 [89 N.E. 118, 123].)

In *Jeffrey* v. *Osborne* (1911) 145 Wis. 351 [129 N.W. 931], the record showed that the landowner who claimed severance damages because of deprivation of the expansion potential of his plant site, had in fact acquired adjacent available property. The reviewing court upheld the trial court's sustaining of objections to questions asked of the landowner's witness concerning the effect of the availability of the adjacent land on the value of the remaining plant site, and its refusal to give instructions which would permit the jury to consider that factor. These rulings, however, rested upon the law of the case as established in a prior appeal. The court in fact stated, "As an original proposition we should find it very difficult, if not impossible, to sustain the rulings of the trial court. If, as the witnesses testified, the damages would be enhanced because opportunity for expansion of the works was impaired or destroyed by the taking of the strip, it would seem logically to follow that the fact that the opportunity for expansion still existed by the expenditure of a comparatively insignificant sum of money would have a vital bearing on the question of the amount of the damage, i.e. reduction in market value suffered by the remainder of the plant." (145 Wis. at p. 359 [129 N.W. at p. 934].)

In *St. Patrick's Church* v. *State of New York* (1968) 30 App.Div.2d 473 [294 N.Y.S.2d 275], the court dealt with facts strikingly similar to this case, "In 1960 claimant purchased a 3.909-acre tract of land and it is undisputed that the acquisition was for the specific purpose of erecting a church, school, rectory and convent and that its then formulated plans also included the necessary recreational area for the new complex. At the time of the appropriation of .977 acre by the State in 1965, construction of the church had been completed and the balance of the buildings were to be erected in the near future as well as the completion of the recreational area.

The State concedes that after the appropriation, the reduced area of the remaining land was insufficient for the original best available use of the property and for the completion of the planned catechetical center." (30 App.Div.2d at p. 474 [294 N.Y.S.2d at p. 276].) The state claimed that excessive severance damages, $27,200, were granted because the church 14 months after the taking brought an equivalent amount of adjacent land, with improvements of a value of $20,000 for $25,000, thereby demonstrating that the consequential damages to the remainder were only $5,000. The court ruled, "We are not here dealing with any mitigation of damages by something that occurred or could occur upon the property remaining after the appropriation as in *Mayes Co.* v. *State of New York,* 18 N.Y.2d 549 [277 N.Y.S.2d 393, 223 N.E.2d 881], where the 'cost to cure' theory was allowed because the cure was to occur *within* the bounds of the claimant's lands. Sound reason requires that the theory cannot be used in cases of subsequent acquisitions of lands outside the bounds of the appropriated property; nor should a condemnee's right to compensation be made to depend upon whether adjacent land could easily be purchased. These established principles are clearly recognized in 4 Nichols, Eminent Domain (3d ed.) (§ 14.22, p. 525) where, in referring to the rule of cost of restoration, it is stated that 'the restoration must be possible without going outside the remaining portion of the tract in controversy'; and again in section 14.2472 (p. 683), 'It has recently been held that whether premises of a like description to those taken are readily available or whether it was owner's intention to seek similar property was not relevant to the question of the fair market value of condemned premises' (citing *Jones* v. *Providence Redevelopment Agency,* 92 R.I. 285 [168 A.2d 156]). That the adoption of the novel theory advanced by the State, illogical in its foundation, might well lead to confusion and havoc in the use of well-reasoned and judicially founded principles of providing just compensation for the taking of a citizen's lands, is all too evident." (*Id.,* p. 475 [*id.,* p. 277].) This decision is persuasive on the question of whether actual outlays after the taking for acquisition of adjacent property should be considered. It does not consider, however, or, if it does, it erroneously fails to recognize, that the adaptability of the property after its taking and its value for its prior acknowledged best use may in truth be affected by the availability of adjacent land. (See *Edgcomb Steel of New England, Inc.* v. *State, supra,* 100 N.H. 480, 488 [131 A.2d 70, 77] which the New York court attempted to distinguish on other grounds.)

 It is concluded that the city was entitled to show that the adaptability of the church land for its original purposes, and the value of the remainder, after the taking were affected by the availability of adjacent land for the expansion thwarted by the condemnation. The offer of proof, however, was insufficient to establish that state of facts. The fact that the

church was seeking to secure property was not probative of the proper issue, which was sensed by the court, of the general availability of property for expansion.

*Early Church Plans*

The city produced 1954 records of the county planning commission which apparently had jurisdiction over the property prior to the incorporation of plaintiff city. An application for a land use permit for a church was filed January 28, 1954. It reflected that the church at that time owned merely a rectangle with access to the abutting street on the east, and that it proposed to erect a church on the south side of the property and devote the residue to parking. The use permit was granted on those terms by the planning commission and approved by the board of supervisors on March 9, 1954.

On August 11, 1954, an application was filed to amend the existing land use permit to permit the construction of a youth center and the erection of a sign. This permit was granted October 4, 1954 on conditions, among others, that an access road be provided to the north to Gregory Lane, and that the property be developed in accordance with a plot plan dated September 22, 1954, which showed the auditorium or chapel on the southerly side as before, and a youth building and chapel in the approximate location of the first structures actually erected on the property. The plan indicated that parking space whould be provided for 32 cars in the right of way to Gregory Lane.

The offer of these records in evidence was rejected after an unreported colloquy at the bench. The city now asserts that the records should have been admitted to show that prior to 1957 the church had a different schematic design for the development of the property, and secondly to indicate that the horizontal projection of the "L" was required to be maintained for parking and as access to Gregory Lane.

No abuse of discretion is found in the rejection of this evidence. The fact that the church had certain plans in 1954 was of little relevance of the needs and plans of the church over 10 years later. There was no dispute, but that a portion of the property taken was used and presumably would have been continued to be used for access to Gregory Lane. The use permit requirement, assuming it persisted under the city government, was merely cumulative evidence.

*Cross-Examination of the Church's Ex-Appraiser*

Over the objection of the church, the city was permitted to call as a witness an appraiser who had made an appraisal for the church before they retained their present counsel. (See, *People* ex rel. *Dept. Public*

*Works* v. *Donovan, supra,* 57 Cal.2d 346, 354-357; and cf. *People* ex rel. *Dept. Public Works* v. *Miller, supra,* 231 Cal.App.2d 130, 133-135.) The court correctly prescribed that the issue of why the church had not called the appraiser was immaterial and could not be gone into by either party. (See *People* ex rel. *Dept. Public Works* v. *Miller, supra,* 231 Cal.App.2d at p. 134.)

■ The city complains because it was not permitted to call the appraiser as an adverse witness and subject him to cross-examination. (See, Evid. Code, § 776, particularly subd. (d) (3) and (4)[14]; Code Civ. Proc., former § 2055; Law Revision Commission Comment, following § 776 in Deering's Evid. Code Annotated; and Witkin, Cal. Evidence (2d ed. 1966) §§ 1187-1192, pp. 1098-1102.) A literal application of the statute shows that the witness was an employee of the church at the time he obtained knowledge of the matter concerning which he was sought to be examined under this section. Analysis, however, indicates that the prime matter with respect to which he was being examined was the knowledge and opinion which he applied to facts which were open to any member of the public. (See, *Grand Lake Drive In, Inc.* v. *Superior Court* (1960) 179 Cal.App.2d 122 at pp. 126 and 129 [3 Cal.Rptr. 621, 86 A.L.R.2d 129].) Since the church disclaimed the use of his knowledge and opinion, and no longer employed him for that matter, the mere fact that the witness instituted some inquiry and compiled data at the request of the church did not perpetuate his status as "a person identified with" that party. The court properly required the city to make the appraiser its own witness. Moreover, the city has failed to show how it was prejudiced by the manner in which it was required to examine the witness.

*Improper Communication Between Witness and Juror*

■ The city claims prejudicial error because its motion for a mistrial and its request for replacement of a juror with an alternate was denied, after it appeared that there had been a conversation between the juror and an appraisal witness for the church. (See Code Civ. Proc., § 611;

---

[14]Section 776 provides in part: "(a) A party to the record of any civil action, or a person identified with such a party, may be called and examined as if under cross-examination by any adverse party at any time during the presentation of evidence by the party calling the witness . . . (d) For the purpose of this section, a person is identified with a party if he is: . . . (1) A person for whose immediate benefit the action is prosecuted or defended by the party. (2) A director, officer, superintendent, member, agent, employee, or managing agent of the party or of a person specified in paragraph (1), or any public employee of a public entity when such public entity is the party. (3) A person who was in any of the relationships specified in paragraph (2) at the time of the act or omission giving rise to the cause of action. (4) A person who was in any of the relationships specified in paragraph (2) at the time he obtained knowledge of the matter concerning which he is sought to be examined under this section."

and Annotation (1957) 52 A.L.R.2d 182.) The juror involved had admitted on *voir dire* that he had purchased a home from the witness 18 years before. One of the attorneys for the city moved for a mistrial, and reported to the court that he had observed the two men conversing for about two minutes on the courthouse steps, and overheard the juror tell the witness, "I will drop in and see you when this is over." By agreement of the parties the judge interviewed the juror in chambers.

The judge reported that he was satisfied that the juror had told him all that occurred, which was a social greeting recalling the past transaction, without any discussion of the pending case.[15] The city asserted that it believed itself prejudiced because the fact that the juror was actuated to reopen his acquaintance with the witness after a lapse of 18 years indicated that he might be predisposed to give the appraiser's testimony more weight. It requested the juror's replacement by the available alternate juror. The court concluded that there was no prejudice, and that in any event the replacement of the juror would lead the remaining jurors to infer misconduct that might prejudice their deliberations. It denied the city any relief. The question was reviewed in connection with the city's motion for a new trial, and the court stated, "I was completely satisfied at that time that there was nothing improper involved."

In *Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141 [45 Cal.Rptr. 313, 403 P.2d 721], the court ruled that the judge had discretion to dismiss a juror, later elected as foreman of the jury, who had been found talking with counsel for one of the parties during a recess, and that it was error to fail to do so and replace the juror with an available alternate. (63 Cal.2d at pp. 144-145. See Code Civ. Proc., § 605.) The nature of the conversation, which was discussed in chambers with counsel, is not revealed. The case turns on the power of the court to replace a juror under section 605 of the Code of Civil Procedure, and indicates that a juror who converses with counsel may be deemed "unable to perform his duty." The facts of this case do not dictate a categorical extension of the same principle to a juror who converses with a witness.

It is generally held that a mere communication between a witness

---

[15]The reported conversation as related by the court was as follows: "I just had Mr. Murray, juror number ten in and I told him that we had a report that he had been in conversation with Mr. Wallace when Mr. Wallace was leaving after having completed his testimony and he readily admitted this was so. He said that Mr. Wallace had sort of recognized him he thought so he went over to him and said, 'I am Mr. Murray and you sold me a house once' and just introduced himself and mentioned that he noticed Mr. Wallace appeared to be in quite poor health. He said Mr. Wallace said to him, 'that's a long time ago. When this is all over and I can talk to you, I'd like to have you drop by and say hello. My office is now ——' and he told him where it was and he said it was close by the Western Bank, whatever that is, and said that that was the extent of the conversation."

and a juror in a civil action is not a ground for setting aside the verdict or granting a new trial in the absence of a showing that the juror was influenced by such communication to the prejudice of one of the parties to the action. (See Annotation, *supra,* 52 A.L.R.2d 182, 185.) "Where misconduct of a juror is urged, prejudice from that misconduct must be shown. [Citation.] The trial court passed upon the matter and by its denial of the motion for a new trial, determined that the alleged misconduct of the juror was not prejudicial. There is no showing of abuse of discretion. Under such circumstances, the trial court's decision will not be disturbed on appeal. [Citation.]" (*People* v. *Thomas* (1952) 108 Cal.App.2d 832, 837 [239 P.2d 914].)

### Misconduct by Violation of Jurors' Duties

In connection with its motion for a new trial the city offered the declaration of one of the jurors[16] to show that some jurors had discussed the case among themselves during the trial, that one juror had independently viewed one of the properties which was the subject of a comparable sale referred to by a valuation witness for the church, and that some of the jurors had formed and expressed opinions on the merits of the case before the case was submitted to them. (See Code Civ. Proc., § 611; and 2 Witkin, Cal. Procedure (1954) Trial, §§ 74 and 76, pp. 1804-1805 and 1806.)

The city's prayer that this court formulate additional exceptions to the rule prohibiting a juror from impeaching the verdict except on particular grounds hereinafter discussed, was answered by the Supreme Court of this state on the eve of oral argument in this case. In *People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], the opinion reviews the history of the rule first enunciated by Lord Mansfield (71 Cal.2d at pp. 346-351) and concludes, "We therefore hold that jurors are competent witnesses to prove objective facts to impeach a verdict under section 1150 of the Evidence Code. To the extent that *Sopp* v. *Smith, supra,* 59 Cal.2d 12 [27 Cal.Rptr. 593, 377 P.2d 649], *Kollert* v. *Cundiff, supra,*

---

[16]The notice to prepare clerk's transcript (Cal. Rules of Court, rule 5(a)) designated among other papers and records, "the notice of intention to move for and motion for new trial and ruling on it . . . and all papers and records on file in this matter from the inception of the case through the date of this notice." The clerk included the papers constituting the judgment roll (see Code Civ. Proc., § 670), the papers required by rule 5(d), and two orders made concerning immediate possession. Neither the declaration filed with the notice of intention to move and motion for a new trial nor any counterdeclarations were included in the clerk's transcript. The transcript includes a certificate that no requests for its correction were filed. (See rule 8(a).) No motion has been made to augment and correct the record. (Rule 12(a).) This court, however, on its own motion ordered the declarations to be transmitted to it and they are now deemed a part of the record on appeal. (*Id.*)

50 Cal.2d 768 [329 P.2d 897] and similar cases are contrary to our conclusion herein, they are overruled." (*Id.,* p. 351.)

In this case the court indicated—despite the prior rule—that it had read the affidavits of the 12 jurors "the one in support of the motion and the eleven in opposition thereto. . . ." The church filed points and authorities which raised the prohibition of the prior rule, and in oral argument its attorney briefly alluded to the impropriety of considering the affidavit of the juror. The church, however, did prepare and file declarations secured from the other 11 jurors, and in oral argument counsel concluded as follows: "I was going to make some comment about the declarations, your Honor, but you have said you have read them. That's good enough for me." The court, in taking the matter under submission, observed, "I noted as I went through the affidavits that the age of the 11 jurors and I have just now averaged it out—apparently they average about 46 years of age and so it was a rather matured jury as far as age goes. And, the consistency with which the other 11 jurors remarked about Mr. Wells as his approach to the jury problem discounted in my mind to a considerable extent the weight of his affidavit; but, I will give this some more thought." On this record one can conclude that the court passed on the factual issues raised by the affidavits.

The lone juror alleged that four named jurors were discussing the case during the trial, two of them on many occasions. ■■■ "It is of course improper for jurors to discuss a case prior to its submission to them. . . ." (*Smith* v. *Brown* (1929) 102 Cal.App. 477 , 484 [283 P. 132]. See also, *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.* (1909) 156 Cal. 379, 395-396 and 397-400 [104 P. 986]; *Wilson* v. *California Cab Co.* (1932) 125 Cal. App. 383, 386 [13 P.2d 758]; *People* v. *Lawler* (1926) 79 Cal.App. 207, 210-211 [249 P. 18]; and *Tunmore* v. *McLeish* (1919) 45 Cal.App. 266, 268 [187 P. 433].) Insofar as any juror formed and expressed an opinion prior to the submission of the case, he violated the prescribed protocol for the performance of his duties. (Code Civ. Proc., § 611; and see *Kimic* v. *San Jose-Los Gatos etc. Ry. Co., supra;* and *People v. Lawler, supra.*)

The jurors allegedly involved all subscribed allegations to the effect that the jurors did not discuss the case except in the jury room. The city contends that these allegations are insufficient as a matter of law to constitute a denial of the express charges made by the lone dissenting juror. ■■■ The question of the weight and sufficiency of the affidaivits and the credence to be given them was for the trial court. (*Anderson* v. *Pacific Gas & Elec. Co.* (1963) 218 Cal.App.2d 276, 284 [32 Cal.Rptr. 328]; *West* v. *Reigal* (1962) 208 Cal.App.2d 638, 642 [25 Cal.Rptr. 288]; *Balkwill* v. *City of Stockton* (1942) 50 Cal.App.2d 661, 671 [123 P.2d 596]; *Noble* v. *Key System, Ltd.* (1935) 10 Cal.App.2d 132, 143 [51

P.2d 887]; *People* v. *Lawler, supra,* 79 Cal.App. 207, 211; *Tunmore* v. *McLeish, supra,* 45 Cal.App. 266, 269.)

 Moreover, a new trial will not be granted for misconduct of the jury "where the misconduct was of such trifling nature that it could not in the nature of things have been prejudicial to the moving party, and . . . where it appears that the fairness of the trial has been in no way affected by such impropriety, the verdict will not be disturbed. (*Siemsen* v. *Oakland* etc Co., 134 Cal. 494, 498 . . .)" (*Kimic* v. *San Jose-Los Gatos etc. Ry. Co., supra,* 156 Cal. 379, 398. See also, *Philbrick* v. *Weinberger* (1964) 228 Cal.App.2d 681, 688 [39 Cal.Rptr. 617]; *Anderson* v. *Pacific Gas & Elec. Co., supra,* 218 Cal.App.2d 276, 281-282; *West* v. *Reigal, supra,* 208 Cal.App.2d 638, 643; *Watson* v. *Los Angeles Transit Lines* (1958) 157 Cal.App.2d 112, 116 [320 P.2d 890]; *People* v. *Thomas, supra,* 108 Cal.App.2d 832, 837; *Kritzer* v. *Citron* (1950) 101 Cal.App.2d 33, 36-37 [224 P.2d 808]; *Anderson* v. *Pacific Tank Lines, Inc.* (1942) 52 Cal.App.2d 244, 249 [126 P.2d 153]; *Wilson* v. *California Cab Co.* (1932) 125 Cal.App. 383, 386 [13 P.2d 758]; and cf. *People* ex rel. *Dept Public Works* v. *Curtis, supra,* 255 Cal.App.2d 378, 386-392 [63 Cal.Rptr. 138]; and *Tunmore* v. *McLeish, supra,* 45 Cal.App. 266, 269.) Since the trial judge had all the evidence before him on the merits of the case, and as well the conflicting affidavits, he was in the best position to evaluate the prejudicial effect of the alleged misconduct. The finding of no prejudice implied from his denial of the motion for new trial should not be set aside unless there is no evidence to sustain it. (See *Anderson* v. *Pacific Gas & Elec. Co., supra,* at p. 282; *West* v. *Reigal, supra,* 208 Cal.App.2d at p. 642; and *People* v. *Thomas, supra,* 108 Cal.App.2d at p. 837.)

 Any expression of opinion, as distinguished from mere discussion, must be evaluated from the viewpoint of its effect on the other jurors, and its effect as representing the bias of the declarant. (See *Kimic* v. *San Jose-Los Gatos etc. Ry. Co., supra,* 156 Cal. at pp. 399-400.) Here again the findings of the trial court will govern. (*Id.*)

 The city contends that the fact that the jury discussed and considered the matter of noise interfering with the church was misconduct. The church claimed and introduced evidence to show that the construction of the road and the traffic engendered thereby had rendered the remaining property less desirable for what was conceded to be its best and highest use. This matter was properly before the jury because of the particular use of the property.

The allegation that one juror visited one of the properties used as a comparable sale was not unequivocably denied. The accused juror alleged that "he did not visit *the property* except on jury view," (italics added) and that "he did not study the neighborhood." If it be assumed that

this equivocal denial is an admission of a visit to one of the premises referred to as a comparable sale, the city is entitled to rely on the following rule: "It is well established throughout the states of the union and in the federal courts that it is misconduct for a juror during the trial to discuss the matter under investigation outside the court or to receive any information on the subject of the litigation except in open court and in the manner provided by law. Such misconduct unless shown by the prevailing party to have been harmless will invalidate the verdict. [Citations.]" (*Kritzer* v. *Citron, supra,* 101 Cal.App.2d 33, 36. See also, *Kimic* v. *San Jose-Los Gatos etc. Ry. Co., supra,* 156 Cal. 379, 397-398; *Siemsen* v. *Oakland, San Leandro, & Hayward Elec. Ry.* (1901) 134 Cal. 494, 498 [66 P. 672]; *People* ex rel. *Dept. Public Works* v. *Curtis, supra,* 255 Cal.App.2d 378, 390; *Anderson* v. *Pacific Gas & Elec. Co., supra,* 218 Cal.App.2d 276, 280; *Watson* v. *Los Angeles Transit Lines, supra,* 157 Cal.App.2d 112, 116; *Anderson* v. *Pacific Tank Lines, Inc., supra,* 52 Cal.App.2d 244, 249; *Maffeo* v. *Holmes* (1941) 47 Cal.App.2d 292, 295 [117 P.2d 948]; and *Tunmore* v. *McLeish, supra,* 45 Cal.App. 266, 268.) Here again the complaining party must show prejudice. In this case the primary issue was the value of the subject property. The price at which the property allegedly viewed was sold was only relevant insofar as it bore upon the opinion of the witness. The appearance of that property could only remotely affect the value of the subject property. Under these circumstances the trial court was warranted in finding that no prejudice ensued. (See *Siemsen* v. *Oakland San Leandro & Hayward Elec. Ry., supra,* 134 Cal. at pp. 498, 499; *Anderson* v. *Pacific Gas & Elec. Co., supra,* 218 Cal.App.2d at pp. 281-282; and *Noble* v. *Key System, Ltd., supra,* 10 Cal.App.2d 132, 143-144.)

*Concealment on Voir Dire*

 "Concealment by a juror during his *voir dire* examination of a state of mind which would prevent his acting impartially is misconduct constituting an irregularity for which a new trial may be granted under section 657, subdivisions 1 and 2, of the Code of Civil Procedure. [Citations.] Concealment need not be intentional. [Citation.]" (*People* ex rel. *Dept. Public Works* v. *Curtis, supra,* 255 Cal.App.2d 378, 388-389. See also *Philbrick* v. *Weinberger, supra,* 228 Cal.App.2d 681, 687; *Anderson* v. *Pacific Gas & Elec. Co., supra,* 218 Cal.App.2d 276, 283; and *People* v. *Thomas, supra,* 108 Cal.App.2d 832, 837.) Even before *People* v. *Hutchinson, supra,* the jurors' affidavits could be received on this point. (See 71 Cal.2d at p. 348; *People* ex rel. *Dept. Public Works* v. *Curtis, supra,* 255 Cal.App.2d at p. 389; and *Anderson* v. *Pacific Gas & Elec. Co.,*

*supra,* 218 Cal.App.2d at p. 283; and *Winningar* v. *Bales* (1961) 194 Cal.App.2d 273, 278 [14 Cal.Rptr. 908].)

The jurors' declaration filed by the city charges that juror Steede, who became the foreman, expressed the opinion that cities should not have the right to condemn property. At the outset of the trial the court asked the prospective jurors collectively, "If you are sworn as jurors are there any among you who would not be willing to take the law applicable to this case from the Court? . . . Have any of you any prejudice from any cause whatsoever against bringing of an action in a condemnation to acquire property for a public purpose? Any of you feel that this is something that shouldn't be done?" There is no indication in the record that any prospective juror raised his hand to indicate an affirmative answer as the jurors had been directed to do by the court. When called to the jury box Steede assured the court that his answers to the question which had been asked would not be materially different from the answers that had been given, and that he was sure he could be fair and impartial. Nothing to indicate the contrary was elicited by the church, and the city asked no questions of the prospective juror. In his counterdeclaration Steede denied "each and every one of the allegations of misconduct," denied making "such statements" and denied that he was prejudiced in any way against the city.

Here again the city contends that a strict interpretation of the allegations in the counteraffidavit shows that they fail to meet the charges made. The record reflects that this contention was made and considered by the trial court, and that the judge indicated doubts concerning the weight to be given the affidavit of the lone dissenting juror.

With respect to juror McClarinon, the charge was that she concealed her prior knowledge that the church was doing fabulous youth work. She allegedly had stated, "I have no prejudice toward anyone and did not have in this case. I knew nothing of this church of its activities other than the evidence presented, and any statements I made were based on the evidence." Here again the court considered the conflicting affidavits.

On this record the declarations of the accused jurors provided ample support for a finding, implied in the ruling of the court on the motion for new trial, that neither juror was prejudiced against the city prior to his selection as a juror. (*Anderson* v. *Pacific Gas & Elec. Co., supra,* 218 Cal.App.2d at p. 284; *West* v. *Reigal, supra,* 208 Cal.App.2d 638, 642, and see other cases cited above in connection with the conflicting affidavits with respect to the charge that the case was discussed among the jurors prior to submission.)

Moreover, it is questionable whether the statements attributed to Mrs.

McClarinon, if in fact made, rise to the dignity of demonstrated conceal-
ment of a prejudiced mind. (See *Philbrick* v. *Weinberger, supra,* 228
Cal.App.2d at pp. 687-688; *Winnengar* v. *Bales, supra,* 194 Cal.App.2d at
pp. 278-280; *People* v. *Thomas, supra,* 108 Cal.App.2d at pp. 836-837;
and *Mast* v. *Claxton* (1930) 107 Cal.App. 59 at pp. 65-69 [290 P. 48];
but cf. *People* ex rel. *Dept. Public Works* v. *Curtis, supra,* 225 Cal.App.2d
at pp. 389 and 390-391.)

In the case of Steede, it further appears that his vote was not needed for
the verdict. Under these circumstances it has been held that no prejudice
requiring setting aside the verdict or reversal is demonstrated by showing
the misconduct of a single juror. (See *Philbrick* v. *Weinberger, supra,* 228
Cal.App.2d at p. 688; *West* v. *Reigal, supra,* 208 Cal.App.2d at p. 643;
*Watson* v. *Los Angeles Transit Lines, supra,* 157 Cal.App.2d at p. 116;
*Kritzer* v. *Citron, supra,* 101 Cal.App.2d at p. 36; and *Anderson* v. *Pacific
Tank Lines, Inc., supra,* 52 Cal.App.2d at p. 249.) Nevertheless, if Steede's
alleged prejudice was, as alleged by his accuser, communicated to and
acted upon by the other jurors, it could require a new trial. (See *People* ex
rel. *Dept. Public Works* v. *Curtis, supra,* 255 Cal.App.2d at pp. 390 and
391.)

In *Kritzer* v. *Citron, supra,* the court under prior law refused to consider
the affidavits of the prevailing jurors to show that the misconduct did not
result in their receiving improper information. (101 Cal.App.2d 36-37.)
In *Kimic* v. *San Jose-Los Gatos etc. Ry. Co., supra,* the court stated, "It is
thoroughly settled that jurors cannot be heard to deny the prejudicial
influence on their minds of knowledge acquired by misconduct. [Cita-
tions.]" (156 Cal. at p. 397.) This rule prohibiting evidence of a jurors'
subjective state is retained in the Evidence Code, which provides in section
1150, subdivision (a), ". . . No evidence is admissible to show the effect
of such statement, conduct, condition, or event upon a juror either in
influencing him to assent to or dissent from the verdict or concerning the
mental processes by which it was determined." (See *People* v. *Hutchinson,
supra,* 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) Even if the
intimation in the declaration of any of the remaining jurors to the effect that
his subjective reasoning process was not affected by anything said or done
by Steede be disregarded, the city still has failed to show that any such juror
was influenced by the opinion, as distinguished from fact, assertedly
communicated to the jury by Steede.

## Quotient Verdict

Section 657 of the Code of Civil Procedure, in referring to misconduct of
the jury as a grounds for a new trial, provides: "2. . . . whenever any one or

more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors; . . ."

In *Dixon* v. *Pluns* (1893) 98 Cal. 384 [33 P. 268, 35 Am.St.Rep. 180, 20 L.R.A. 698], the court ruled as follows: " 'Chance' may be defined to be hazard, risk, or the result or issue of uncertain and unknown conditions or forces, and the facts here developed bring the case clearly within such definition. In the present case each juror agreed that a definite amount should be the verdict of the jury, at a time when he had no knowledge whatever as to what the amount should be, for it had not yet been computed. No person even knew the figures upon which the computation would be made. If the estimate of each juror is before the eyes of the others when the agreement is made, then no element of chance will be found in the result, for it would be a mere matter of mathematical computation; but without a knowledge of these estimates, the character of the verdict will be as entirely unknown to the jurors as though the whole matter were decided by the casting of a die, or the tossing of a coin. In the casting of a die, or the tossing of a coin, justice has an equal chance with injustice, but under the system here considered, one unscrupulous and cunning juror always has the power to defeat justice by increasing or decreasing the amount of the verdict in proportion as he places his estimate at an unconscionably high or low figure. In the casting of a die the chance of winning or losing is dependent upon the face of the die that presents itself after the cast. In arriving at a verdict in the manner here practiced, the chance of the respective parties, plaintiff and defendant, to secure the verdict is entirely dependent upon the sum total of the estimates made by the various jurors, and that sum total is as uncertain and unknown to the jurors at the time the agreement is made as the result of the cast is unknown to the gamester. We are clearly of the opinion that this verdict was obtained by a resort to chance. . . ." (98 Cal. 384, at p. 387. See Annotation, Quotient Verdict (1966) 8 A.L.R.3d 335, at pp. 339, 340, 345-348.)

 The affidavit of the lone juror filed on the city's behalf indicates that in determining severance damages the jurors pooled or averaged their respective opinions as to value, and pursuant to prior agreement returned that sum so produced as compensation for the damages to the property remaining. On the other hand, it is conceded that the other 11 jurors averred that there was no agreement that the jurors would be bound by the figure arrived at after adding up the figures and dividing by 12, and that they voted on the figure later.

 Under the latter circumstances the situation is governed by the rule set forth in *Balkwill* v. *City of Stockton, supra,* 50 Cal.App.2d 661,

670-672. There the court stated, "A quotient verdict does not necessarily constitute a chance verdict, provided the average sum which is thus procured is not adopted without subsequent consideration or balloting by the jurors. If, after a quotient figure is obtained, the jurors discuss and ballot upon the adoption or rejection of that sum, it is conclusive evidence they were not bound by a previous agreement to accept it without further consideration." (50 Cal.App.2d at p. 671. See Annotation, *supra,* 8 A.L.R.3d, at pp. 349-358.)

 The determination of the trial court on conflicting declarations that the facts lay within the latter rule is binding on this court. (*Balkwill* v. *City of Stockton, supra,* 50 Cal.App.2d 661, 671; and see cases cited above to this point.)

*Misconduct of Counsel*

The city has grouped its complaints concerning the misconduct of counsel for the church in three categories.

First it complains that there were repeated references to noise and distraction and inconvenience caused by having the public street in front of the church. Testimony to this effect was elicited without objection from the pastor, a member of the congregation, the rabbi, the minister, and the two real estate appraisers presented by the church. Counsel also referred to this condition as existing after the taking in his oral argument without objection. "Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished." (*Horn* v. *Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561]; accord *Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750].) Moreover, the jurors were correctly instructed concerning the elements to be considered in assessing severance damages.[17] The evidence was properly admitted and alluded to, not because it showed elements which interfered with the condemnee-church's particular pleasure or enjoyment, or because it showed the church property was subjected to detrimental factors which were common to all properties in the neighborhood, but because the matters adduced were proper elements to be considered in determining the value of the remainder of the property of which the city had taken a portion. (Cf. *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 294-295 [74 Cal.Rptr. 521, 449 P.2d 737], with *People* v. *Symons* (1960) 54 Cal.2d 855, 858-859 and 860-862 [9 Cal.Rptr. 363, 357 P.2d 451].)

---

[17]See footnote 7 above.

The question of how much the portion not sought to be condemned would be benefited by the construction of the new road (Code Civ. Proc., § 1248, subd. 3) was among the issues at the outset of the trial. When the defendant through its first expert appraisal witness sought to explain why he had not found any benefit to the property, because it was equalized by an assessment lien, the city promptly objected. Thereafter, after argument out of the presence of the jury the trial court applied the following rule from *Oro Loma Sanitary Dist.* v. *Valley* (1948) 86 Cal.App.2d 875, 884 [195 P.2d 913]: "The trial court was correct in its refusal to offset against severance damages the special benefits, if any, derived from the construction of the improvement, for the reason that under the Municipal Improvement Act of 1913, the defendant had already paid for such benefits." Thereupon the city withdrew its claim of special benefits and the church was precluded from showing the amount its property had been assessed for the construction of the road. Nevertheless, counsel for the church sought to bring out that the church had opposed the opening of the new street, and had paid its share of the cost of constructing it. The matter first came up as noted above when witness Wallace testified that there was a $14,000 assessment against the property. After the court announced its ruling in chambers, counsel for the city suggested "the least said about it [the assessment] the better," and he acquiesced in the court's suggestion that the appraiser's working paper be replaced by a new one which would not indicate any adjustment for the assessment.

Subsequently counsel for the church in cross-examining a clergyman who appeared as a witness for the city asked him if he had been advised that the church had fought to keep the road off of its property, and if he had been advised as to how much money had been assessed against the church. The city's objection to the first question was sustained, and its complaint of misconduct to the second question was answered by the following admonition from the court, "Whether there has been or has not been any assessments is beside the point. It is immaterial and the jury is instructed to disregard any reference thereto whenever they may chance to hear it."

The city called the former pastor of the church as a witness. He testified that in his opinion the construction of the new street benefited the church, and that it did not make it necessary for the church to move its location elsewhere. On cross-examination he was asked if the church had appeared and protested the assessment. The city's claim of misconduct resulted in a hearing outside of the presence of the jury at which the court ruled that the question was proper cross-examination in order to prevent the impression that his views as former pastor represented the views of the church at the time he so served, and to determine whether he entertained that view despite the views of the church he served. The witness then affirmed that the church had so protested.

By way of recross-examination of the architect who prepared the controversial 1957 plan, and who was called as a witness for the city, counsel for the church interjected at the conclusion of the re-direct examination, "And they have paid for that road, their fair share of it?" The city charged prejudicial misconduct, but asked for no further relief or admonition after the court observed, "Gentlemen, I mentioned a little while ago that I think we are getting too far afield for this witness. This witness wasn't·called for an expert on land appraisal, he was called for a limited purpose."

The city further complains that counsel for the church was guilty of prejudicial misconduct in attempting to show that the architect had violated a confidential relationship by testifying against his former client. The city's objection to this line of questioning was sustained, apparently on the theory that any privilege which might exist was waived by use of the diagram. Subsequently, an objection to counsel's reference to "the file pertaining to my people's rights in this thing" was similarly sustained, and the court addressed the witness in terms of "your file." A further reference to "the confidential relationship you have with a client," met with an objection, sustained by the court with the comment, "I think I have ruled on this." It appears that the city was sustained on each occasion that its adversary attempted to so improperly impeach the witness. In the absence of a request for an admonition to purge the effect of the questioning it is in no position to pursue a further objection at this stage of the proceedings. (See *Sabella* v. *Southern Pac. Co., supra,* 70 Cal.2d at p. 318.)

Reference to the instances in which counsel referred to the city's protest or payment in the assessment proceedings indicates that on the first occasion the city expressly requested that no further mention be made of the subject; on the second occasion the objection was sustained and the jury was properly admonished; and on the third occasion the court properly permitted cross-examination on a subject which had been opened up by the city. On the last occasion the city's objection was sustained, and its failure to request a further admonition precluded consideration on appeal under the precedents which have been adverted to above.

The church's reference in argument to the fact that the church needed all of the property, fought the city to keep the road off the property, and wanted the land, met with no objection. Moreover, it was accompanied by an admission from counsel that the church's rights were no greater or less by reason of those circumstances. No cognizable misconduct is found in reference to the foregoing subjects.

A subsequent reference to the fact that the church was awaiting the termination of the litigation before moving, and was not delaying because it did not need all of the original land was objected to on the grounds that there was no showing that the city had occasioned any delay in the litigation. No other impropriety was suggested, nor was the court requested to admonish the jury other than in the general terms to disregard statements of counsel which were not supported by the facts, which it in fact did in response to the objections.

The real estate appraisers for each side were examined concerning the purchase, rezoning, and resale of a portion of a parcel of unimproved land in the vicinity. It appears that the joint purchasers included some city officials. The church wanted to bring out these special curcumstances as affecting the original price, and the city objected. The court took the position that inquiry into the official position of some of the purchasers and the question of whether there was an abuse of such position in securing a rezoning, would raise too many collateral issues. In the course of the discussion counsel for the city indicated, "Well, at this particular time I don't have any motion to make, Judge, except that . . . until our case is closed I would like to reserve the right or possibility at least of coming back in and asking the Court for an opportunity to show that Mr. Maguire did not hold the position that counsel has represented that he did." The court indicated that it would deny such proof because the other purchasers held city positions anyway.

The first reference was by the church's witness Wallace, who referred to the original purchasers as including James McGuire and another councilman. No objection was interposed. Its witness Johnson referred to the purchasers by name without official title. He pointed out, without objection, that the city put in curbs, gutters and sidewalks adjacent to the property. In cross-examining the city's witness Johnson, counsel for the church referred to the transaction as "a sale over here on Gregory to a couple of city councilmen" and the witness advanced the name James McGuire and affirmed counsel's suggestion that the other was a Mr. Ben Hartinger. He did not know if any other persons in on the purchase were city officials. He acknowledged that it was rezoned after the purchase. No objection was interposed to any of this testimony. Finally, in closing argument in reference to the weight to be given the testimony of the city's witness Johnson, counsel stated, "He is making an erroneous assumption or erroneous data coming in here with a mayor's apartment house . . ."; and he adverted to the facts that the original sale was before zoning and that the property was rezoned before the second sale for apartment house use. No objection or request for an admonition was made by the city.

It is obvious that the city failed to make a record which would permit a review of the alleged misconduct with reference to the subject of this comparable sale.

*Conclusion*

As in most condemnation actions, there was a great disparity between the damages as evaluated by the respective witnesses for the condemner on the one hand, and the condemnee on the other. As in many actions this disparity may be predicated on diverse theories as to whether severance damages were suffered, and on divergent theories of valuation. Eleven jurors, and the trial judge, in ruling on the motion for new trial, accepted the theory that the remaining property suffered a dimunition in value by the taking.[18] Although there is substantial evidence to show that this is a case in which the church can eat its cake (the severance damages in the judgment), and have it (the remaining property and the existing improvements) too, there is substantial evidence to support the contrary theory. Despite the numerous claims of the city which have been thoroughly explored, the verdict is untainted except for the testimony of the pastor as to value.

Under the Constitution, "No judgment shall be set aside, or new trial granted, in any cause, on the ground . . . of the improper admission of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243]; *People* v. *LaMacchia, supra,* 41 Cal.2d 738, 754; *Long Beach City High School Dist.* v. *Stewart, supra,* 30 Cal.2d 763, 775; *People* ex rel. *Dept. of Public Works* v. *Alexander, supra,* 212 Cal.App.2d 84, 92, 98 and 101. See also, *Kalfus* v. *Fraze* (1955) 136 Cal.App.2d 415, 423 [288 P.2d 967]; and cf. *People* ex rel. *State Park Com.* v. *Johnson, supra,* 203 Cal.App.2d 712, 716-718 and 720.) ▮ It is recognized that "in determining whether or not an error is prejudicial, under article VI, section 13 of the Constitution, the appellate court must weigh the evidence." (See *People* v. *Mabry* (1969) 71 Cal.2d 430, 454, fn. 2 [78 Cal.Rptr. 655, 455 P.2d 759], Peters, J. dissenting.) Among the factors to be considered are whether the evidence is cumulative (see *People* v. *LaMacchia, supra,* 41 Cal.2d at p. 752; *Estate of Arbulich* (1953) 41 Cal.2d 86, 93-94 [257 P.2d 433];

---

[18]The juror's affidavits, which have been reviewed in connection with other issues of fact, as distinguished from opinion, may not be resorted to for the purpose of establishing the subjective reasoning processes of the jury. (See *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) They do indicate, however, that the $47,000 was arrived at by discounting the value of the improvements, which ultimately would be lost to the church by reason of inability to grow on the restricted space remaining, because the rate of growth of the church indicated the property could be used for some years after the taking.

and *Kalfus* v. *Fraze, supra,* 136 Cal.App.2d at p. 423), and, in condemnation actions, the relationship between the amount of the award, the questioned testimony, and the other testimony of value which has been received in evidence. (See *Long Beach City High School Dist.* v. *Stewart, supra,* 30 Cal.2d at p. 775; and *People* ex rel. *Dept. Public Works* v. *Alexander, supra,* 212 Cal.App.2d at p. 101. Cf. *People* ex rel. *State Park Com.* v. *Johnson, supra,* 203 Cal.App.2d at pp. 717-718.)

 Superficially it appears that the pastor's testimony may have influenced the verdict, at least, the damages awarded for the property taken. The jury accepted the figure of $1.50 per square foot for a total value of $39,000 (see Appendix A). The church's witness Johnson testified to a similar value. Although his qualifications and the basis for his opinion have been attacked by the city, the evidence of his experience in real estate matters was uncontradicted. The jurors had before them the evidence of comparable sales upon which the qualified appraisers for each side had relied. They were fully apprised of the weakness of the basis of the pastor's opinion by the rigorous cross-examination to which he was subjected. Parenthetically it may be noted that no motion to strike his testimony was made when it was evinced that his opinion was predicated entirely upon the opinion of others. In another context the court observed in the *Alexander* case, "The testimony of the witness as a whole was based on his investigation of locations of possible sites for restaurants, motels and similar business establishments along the full line of the highway, and it was necessarily brought home to the jury that Mr. Perry was considering value from the standpoint of a commercial operation such as his own business. We do not believe that the jurors could have missed the implications flowing from his testimony; they must have been well aware of the basis for his opinions with respect to value." (212 Cal.App.2d at p. 93.)

So here the jury had before it, not only opinions, but all the data upon which the conflicting opinions were predicated. The disparity between the $1.40 per square foot testified to by Wallace, who was unquestionably competent, and the $1.50 per square foot of the church's Johnson and the pastor is not great. The jurors rejected the city's witnesses' testimony concerning severance damages, and there is no reason to believe that they gave their testimony concerning the basic value of the land greater weight. No miscarriage of justice has been demonstrated with respect to the admission of the pastor's opinion regarding the value of the property taken.

 With respect to severance damages the absence of prejudice is clear. The jurors rejected the testimony that there were no severance damages. It was then left with Johnson's figure of $98,450, the figures given by the pastor and Wallace of about $84,000, and by the rejected church's appraiser of $22,500. The figure returned was appreciably below the

opinion given by the pastor. It does not appear that a different verdict for severance damages would have resulted had his opinion, with its obviously inadequate basis, been excluded.

Under the circumstances, after an examination of the entire cause, this court is of the opinion that it is not reasonably probable that a result more favorable to the city would have been reached had the valuation testimony of the pastor been excluded, and the instruction referring to the testimony of the owner not been given. (Cal. Const., art. VI, § 13, and cases referred to above.)

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied November 28, 1969, and appellant's petition for a hearing by the Supreme Court was denied December 23, 1969.

### APPENDIX A

The tabulations of opinions of the valuation witnesses and the jury verdict is as follows:

| For Defendant | Roadway Acquisition | Severance Damage | Net to Owner |
| --- | --- | --- | --- |
| 1. Lawrence Wallace | $36,950 (1.40 sq. ft.) | $83,800 | $120,750 |
| 2. Paul Johnson | 39,102 (1.50 sq. ft.) | 98,450 | 137,552 |
| 3. R. W. Myrant | 39,000 (1.50 sq. ft.) | 84,256 | 123,256 |
| 4. Floyd Norried | No valuation testimony | Yes—Church not usable | No value given |
| 5. Norman Wedell | No valuation testimony | Yes—Church not usable | No value given |
| 6. Rabbi David Robins | No valuation testimony | Yes—Church not usable | No value given |
| 7. Rev. John Kinsey | No valuation testimony | Yes—Church not usable; value for Church use is $75,000-$80,000 | No value given |

| For Plaintiff | Roadway Acquisition | Severance Damage | Net to Owner |
| --- | --- | --- | --- |
| 1. A. J. Johnson | $26,000 (1.00 sq. ft.) | None | $26,000 |
| 2. Robert Orr | 13,025 ( .50 sq. ft.) | None | 13,025 |
| 3. Vance McMath | 32,980 (1.27 sq. ft.) | $22,500 | 55,480 |
| 4. Rev. James Cruthers | No valuation testimony | No—Church still usable | No value given |
| 5. Rev. Lewis Rhoden | No valuation testimony | No—Church still usable | No value given |
| 6. Rev. Wm. O. Smith | No valuation testimony | No—Church still usable | No value given |
| 7. Charles Dennis | No valuation testimony | No—Church still usable | No value given |
| 8. William Hill | No valuation testimony | No—Church still usable | No value given |
| Verdict of Jury | $39,000 | $47,000 | $86,000 |